[No. 66442-5-I. Division One. August 20, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. SAMUEL M. PIATNITSKY, *Appellant*.

196

198

*Lila J. Silverstein* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney,* and *Randi J. Austell, Deputy,* for respondent.

¶1 Dwyer, J. — Samuel Piatnitsky appeals from the judgment entered on a jury's verdicts finding him guilty of murder in the first degree, attempted murder in the first degree, possessing a stolen firearm, and unlawful possession of a firearm in the second degree. He contends that the trial court erroneously admitted his inculpatory written statement given to the investigating detectives after his arrest. Before the written statement was taken, Piatnitsky was informed of his rights, indicated to the detectives that he understood his rights, and then voluntarily waived those rights. Nevertheless, Piatnitsky asserts that, prior to giving the written statement, he unequivocally invoked his right to remain silent, thus rendering the statement inadmissible at trial. Because the trial court properly found that Piatnitsky did not do so, we affirm.

I

¶2 On October 18, 2008, Nicole Crosswhite hosted a barbecue at her Renton townhouse, where she lived with her six-year-old daughter, her roommate Kendra Bonn, and Bonn's two young children. Most of the guests left the barbeque by around 8:00 p.m. or 9:00 p.m. Only Crosswhite, her sister Ashley Leonard, Bonn, Jeff Manchester, and the children remained at the townhouse. Later that night, Crosswhite's friend, Shawn Jones, called to ask if she wanted to go with him to a casino. Although Crosswhite was getting ready for bed, she agreed to accompany him. Crosswhite left her home to pick up Jones at his house at around midnight. When she left, Leonard, Bonn, and Manchester were watching television, and the children were in bed.

¶3 When Crosswhite and Jones returned around 2:00 a.m., Crosswhite immediately heard loud music coming from the townhouse. In addition to Leonard, Bonn, and Manchester, there were two people in her home, both of whom Crosswhite did not know—Samuel Piatnitsky and

200

Jason Young. Crosswhite soon learned that Piatnitsky and Young had been at the bus stop in front of her home when she left to pick up Jones. Manchester was a friend of Young's brother and had invited Piatnitsky and Young into Crosswhite's home. Although there had been no beer in the home when Crosswhite left, everyone was drinking when she returned. Because she was uncomfortable having two people in her home whom she did not know, Crosswhite told Jones to ask Piatnitsky and Young to leave.

¶4 Jones and Manchester asked Piatnitsky and Young to leave. Piatnitsky replied to the effect of "I will leave when I am ready." A physical altercation thereafter ensued outside of the townhouse. Jones became involved in the fight after Crosswhite asked him to go outside to stop the altercation. Crosswhite saw Jones punching Piatnitsky and observed Manchester kick Young. Then another man, Mike Boyd, who had shown up at the townhouse just before the fighting ensued, broke a beer bottle over Piatnitsky's head. Piatnitsky and Young fled.

¶5 Less than an hour later, they returned. Crosswhite and the others were standing on the front porch when Piatnitsky emerged from the bushes in front of the townhouse with a shotgun. Piatnitsky said, "You guys want some now; what's up now, guys; what's up?" Jones attempted to wrestle the gun away from Piatnitsky, while Piatnitsky and Young punched Jones. Manchester had fled indoors but returned outside to help Jones when he learned that Jones was fighting Piatnitsky and Young. While Manchester fought Young, Jones attempted to gain control of the gun. But when Jones was tossed to the ground and lost his grip on the shotgun, Piatnitsky shot and killed him. Piatnitsky then pointed the shotgun at Manchester, who was on the front porch of the townhouse. Piatnitsky shot Manchester twice, shattering his wrist and breaking his arm in three places.

¶6 Police responded to the scene, where the witnesses provided descriptions and the first names of the suspects.

They gave the police Young's coat, which he had left behind. A K-9 unit then tracked Young's scent to the house where Young, his brother, and his parents lived. Officers found Piatnitsky in the house, hiding in a closet behind a washing machine. Police then transported three of the witnesses to the house, where they each identified Piatnitsky as the shooter and Young as his accomplice. After obtaining a search warrant for the Young residence, police found a shotgun that had been stolen from a car parked 10 blocks away. Forensic testing later demonstrated that the shotgun shells recovered from the scene of the crime had been fired from that shotgun.

¶7 Following their arrests, Piatnitsky and Young were transported to the Maple Valley precinct, where Detectives David Keller and James Allen interviewed the suspects. Prior to arriving at the precinct, Piatnitsky was advised of his *Miranda*[1] rights by one of the deputies who had responded to the scene of the incident.[2] The detectives first attempted to interview Young, but they ceased questioning him shortly thereafter when Young requested an attorney.

¶8 The detectives then interviewed Piatnitsky, beginning at 7:10 a.m. on the morning of October 19. Piatnitsky first put his head on the table in the interview room and told the detectives that he wanted to sleep. Detective Allen then got him a soda, which "seemed to help him a little bit to talk." Piatnitsky told the detectives that he understood the rights that had been read to him earlier that morning. Then, as a ruse, the detectives told Piatnitsky that Young had given them a statement. Piatnitsky replied that they should let Young go and that he, Piatnitsky, would take the blame. During this "rapport building" portion of the interview, Piatnitsky indicated to the detectives that he wanted

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Unchallenged findings of fact entered by the trial court following a CrR 3.5 hearing are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). Piatnitsky does not challenge this trial court finding on appeal.

to convey his version of the events, in his own words, and that he was willing to give an audio-recorded statement.

¶9 At 8:10 a.m., the detectives began an audio-recorded interview of Piatnitsky. At the beginning of the interview, Detective Keller asked Piatnitsky if he recalled being advised of his *Miranda* rights earlier that morning by another officer and whether he understood those rights. Piatnitsky replied, "I have a right to remain silent. . . . That's the, that's the only one I remember. . . . That's the one I, I should be doing right now." Detective Keller reminded Piatnitsky, "Well, you know, like we told you, you don't have to talk to us."

¶10 Detective Keller then began to read to Piatnitsky his *Miranda* rights. Piatnitsky said, "I'm not ready to do this, man." Detective Allen replied, "You just told us that you wanted to get it in your own words on tape. You asked us to turn the tape on, remember?" Piatnitsky responded, "I just write it down, man. I can't do this. I, I, I just write, man. I don't, I don't want . . . I don't want to talk right now, man." Detective Keller said, "Okay, but let's go over the rights on tape, and then you can write it down, okay." Piatnitsky replied, "All right, man." Detective Keller then read to Piatnitsky each of his *Miranda* rights and asked Piatnitsky if he understood each of those rights. Piatnitsky replied in the affirmative.

¶11 Detective Keller then stated:

Okay. I'm gonna give you the form. I just read you these rights. You read 'em earlier. Why don't you sign that you understand these rights right here. And I understand that you don't want to, you don't want to talk about this on tape, and that's your right too, so we'll take a written statement from you; but I want, I want to go ahead and read the waiver of the rights that you're gonna sign here in a second. You understand that you, you've either had read or you have [had] read to you the above explanation of rights and that you understand them. You've decided not to exercise these rights at this time. The following statement is made freely and voluntary and without threats or

promises of any kind. Do you understand that? If you under-
stand, you're willing to talk to us, sign that, and then we'll take
a, I'll turn the tape off, and um, I'll, we'll write down a
statement.

Detective Allen then asked Piatnitsky, "Are you sure you
don't want to do it on tape like you said you did; you want
to get [it] in your own words?" Piatnitsky replied, "Yes, sir."
Detective Keller said, "So you'd rather take a written
statement, do a written one." Piatnitsky replied, but his
reply was mumbled. In the transcript of the audio-recorded
interview, his reply was transcribed as "Yes. I don't know
(unintelligible)." Detective Keller then stated, "Okay, it's too
hard to talk about; you'd rather write it." The detectives
turned off the audiotape at 8:15 a.m.

¶12 Piatnitsky signed the waiver of constitutional rights
form that Detective Keller read to him during the audio-
recorded interview. After the audiotape was turned off,
Piatnitsky provided the detectives with a written state-
ment, in which he admitted to shooting both victims with a
stolen shotgun. Both detectives asked Piatnitsky questions,
and Detective Allen handwrote those statements that
Piatnitsky indicated that he wanted to be included in the
account. Detective Allen wrote only those statements that
Piatnitsky specifically requested to be written. Piatnitsky
looked at the statement several times during the question-
ing, read the completed statement, and indicated changes
to be made, which he thereafter initialed.[3] In addition,
Piatnitsky drew a map for the detectives, depicting the
school where the shotgun had been hidden prior to the
crime.

¶13 The interview ended when the detectives attempted
to question Piatnitsky regarding the fact that he was hiding
in a closet behind a washing machine when he was discov-
ered by police. Piatnitsky became upset with Detective

---

[3] Detective Allen specifically remembered Piatnitsky telling the detectives to
change the word "crawl" to "scurry," such that the statement read that Jones "was
trying to scurry away" from Piatnitsky when Piatnitsky shot him.

Keller and told the detectives that he was "done talking." At that point, the detectives concluded the interview.

¶14 Piatnitsky was charged with murder in the first degree, murder in the second degree, attempted murder in the first degree, assault in the first degree, possessing a stolen firearm, and unlawful possession of a firearm in the second degree.

¶15 Prior to trial, Piatnitsky moved to suppress the statements that he had made to the detectives on the morning of October 19. He contended that the statements were "obtained as a result of his traumatized state of mind of the events on that day, coupled with his head injury, and on top of everything a close fist blow for compliance delivered by [one of the arresting officers]." Piatnitsky asserted that, for these reasons, his waiver of his rights was not knowing and competent. It was illegal, he asserted, for the detectives to "pressur[e] an injured and traumatized person to induce him to waive his rights."

¶16 The trial court held a Criminal Rule (CrR) 3.5 hearing in order to determine the admissibility of Piatnitsky's statements to the detectives. Both Detective Keller and Detective Allen testified at the hearing. The audio-recorded portion of the interview was played for the trial court. In addition, Piatnitsky's written statement to detectives, including the explanation and waiver of constitutional rights that Piatnitsky signed, was admitted as evidence during the hearing.

¶17 Detective Keller testified that, at the beginning of the interview, he and Detective Allen attempted to build a rapport with Piatnitsky. Although Piatnitsky appeared to be upset, he was cooperative with the detectives, who told Piatnitsky that they wanted to get his side of the story. According to Detective Keller's testimony, Piatnitsky told the detectives that he was willing to give an audio-recorded statement. At no time prior to the audio-recorded interview, he testified, did Piatnitsky state that he did not want to speak with the detectives or that he wanted an attorney.

Detective Keller further testified that, although Piatnitsky had superficial cuts to his head and was upset, there was no indication that Piatnitsky was intoxicated or mentally unwell.

¶18 Similarly, Detective Allen testified that Piatnitsky appeared to have no serious injuries; although he had minor scrapes on his face, Piatnitsky showed none of the signs of a concussion. The detective further testified that he at no time during the interview became concerned that Piatnitsky was not lucid or able to communicate. In fact, Piatnitsky "seemed very sharp as far as taking a statement." Consistent with Detective Keller's testimony, Detective Allen testified that Piatnitsky "indicated that he did want to tell us his side of the story, and in his own words" and that he was initially willing to provide an audio-recorded statement. Moreover, Detective Allen testified that, once the written statement was taken, Piatnitsky had no problem reading or understanding what the detective had written. Rather, Piatnitsky "seemed to be paying close attention. In fact, when he changed some key verbiage in there, I thought that was pretty astute, that he was paying close attention to the context of the verbiage."

¶19 Both detectives also testified that the audiotape was turned off at Piatnitsky's request. Detective Keller testified that the unintelligible statement made by Piatnitsky toward the end of the audio-recorded portion of the interview was "[s]omething to the effect that he didn't want to talk right now on tape." Detective Keller was then asked, "At any point after going off tape did the Defendant indicate to you a desire he didn't want to talk to you at all?" Detective Keller answered, "No." He further explained:

> For some reason [Piatnitsky] didn't feel comfortable on tape, but he said multiple times that he did want to give a written statement; he did want to give a statement. And he knew that he could stop questioning at any time, because I told him over and over, at any time you don't have to talk to us, and you can stop the questioning at any time.

According to Detective Keller's testimony, not until after the written statement was taken did Piatnitsky for the first time indicate that he no longer wanted to speak with the detectives.

¶20 Detective Allen similarly testified that Piatnitsky requested that the audiotape be turned off: "He said he would rather write it down; he didn't want to do it on tape anymore." Detective Allen testified that, when he asked Piatnitsky if he was sure that he did not want to get his side of the story in his own words on tape, Piatnitsky verified that he did not want to speak on tape but that he would give a written statement instead. According to Detective Allen, Piatnitsky never indicated after the audiotape was turned off that he did not want to speak with the detectives. Detective Allen testified that, while the written statement was being taken, Piatnitsky "seemed to be thinking about his answers more than necessary if he was just telling me the exact truth of how it happened." He further testified that, once Piatnitsky became upset with questions regarding the fact that he was discovered hiding from police, Piatnitsky said, "I'm done talking." "When he decided he didn't want to talk any more," Detective Allen testified, "we concluded it."

¶21 Following Detective Allen's testimony, the trial court advised Piatnitsky of his rights with regard to the CrR 3.5 hearing. The court advised Piatnitsky that he had the right to testify at the hearing regarding the circumstances of his statements to detectives but that he was not required to do so. Piatnitsky was further informed that his right to remain silent during trial would not be waived by virtue of a decision to testify at the CrR 3.5 hearing. The trial court then gave Piatnitsky the opportunity to confer with his attorney before deciding whether to testify. Piatnitsky did not testify at the hearing.

¶22 The trial court ruled:

> I have had the opportunity to hear the audio recording and the testimony of Detective Keller and Detective Allen, and I am

satisfied that it is clear that Mr. Piatnitsky understood the rights as they were orally given to him on the audio recordings, and there was a written list of rights and a waiver which he signed.

I am satisfied that based on the testimony of the officers and the statement itself, and the audio recording, that there is no objective evidence that he was not able to understand those rights, to make a knowing, voluntary, and intelligent decision to give up those rights and discuss the case with the detectives. . . .

And when I look at all of the transcripts and the context, I am satisfied that the context of the statement clearly indicates that he was willing to talk to the officers. . . .

I am satisfied that in the entire context for whatever reason he wished to have it in a written form rather than an audio form.

So, I am satisfied that there is no objective evidence that the statements were anything other than knowingly, voluntarily, and intelligently made.

¶23 Following the hearing, the trial court entered findings of fact and conclusions of law regarding Piatnitsky's motion to suppress his statements to the detectives. The trial court found that "[a]t no time prior to the conclusion of the interview did the defendant request an attorney or state that he desired to remain silent."[4] The court found that "[a]t all times during the interview the defendant appeared to be coherent, awake, and appropriately responsive to the questions asked."

¶24 With regard to Piatnitsky's statements during the audio-recorded interview, the trial court found that, "[i]n the recorded statement, the defendant state's [sic] that he no longer wants his statement recorded, but will provide the detectives with a written statement." The court made note of defense counsel's argument that Piatnitsky's statement "meant that the defendant was specifically requesting

---

[4] Piatnitsky assigns error to this finding of fact on appeal.

that he be allowed to write his own statement, by his own hand." The trial court further noted that the detectives testified that Piatnitsky never made such a request and "that it is their normal practice to write a statement for a defendant and allow him to review it and make corrections as necessary."

¶25 The trial court concluded, "Upon requesting that he be allowed to provide a written statement instead of a recorded statement, the detectives complied with [Piatnitsky's] request and, upon completion of advising him of his rights, turned off the recorder and took a written statement." The trial court additionally concluded that "[a]lthough the written statement was not written with the defendant's own hand, the defendant was given ample opportunity to review the statement and make changes as he deemed necessary." Moreover, the court concluded that "[t]he detectives' explanation that they do not normally allow suspects to write their own statement because they need it to be legible is reasonable and a common practice of law enforcement." Finally, the trial court concluded, "The context of the recorded statement clearly indicates that the defendant was willing to speak with the detectives, just not on tape."[5]

¶26 Thus, the trial court ruled that Piatnitsky's statements to Detectives Keller and Allen were admissible in the State's case in chief, as the statements were made after Piatnitsky was informed of his *Miranda* rights and he made a knowing, voluntary, and intelligent waiver of those rights.

¶27 At trial, both Detective Keller and Detective Allen testified regarding Piatnitsky's statements. In addition, the written statement was admitted as an exhibit at trial. Piatnitsky also testified at trial, asserting that he had acted in self-defense in shooting Jones and Manchester.

¶28 The jury found Piatnitsky guilty of murder in the first degree, attempted murder in the first degree, possess-

---

[5] Piatnitsky assigns error to this conclusion on appeal.

ing a stolen firearm, and unlawful possession of a firearm in the second degree.[6] The jury found by special verdict that Piatnitsky was armed with a firearm during the commission of the murder of Jones and the attempted murder of Manchester. Piatnitsky was sentenced to 600 months' confinement.

¶29 He appeals.

## II

¶30 At the CrR 3.5 hearing, Piatnitsky asserted different bases for suppression of his statements to Detectives Keller and Allen than he does on appeal. Thus, at the outset, we must set forth with precision the issue before us.

¶31 In his motion to suppress evidence of his statements to detectives, Piatnitsky argued that the statements were inadmissible at trial because he had not knowingly and voluntarily waived his *Miranda* rights. He asserted that his "traumatized state of mind" and his "head injury"—in addition to a "compliance blow" delivered by an arresting officer—precluded a knowing and competent waiver of his rights. He further asserted that the interviewing detectives had "pressured" and "induced" him to waive those rights.

¶32 Defense counsel's argument at the CrR 3.5 hearing focused on the head injury and trauma purportedly suffered by Piatnitsky. Defense counsel asserted that the interrogation was "an extensive push to get information, pushing and breaking the will of an already stressed [person], injured and mentally too tired to be thinking correctly or remembering things correctly." Piatnitsky's "fragile and confused state of mind" caused him to be "incapable" of "freely and voluntarily" waiving his rights.

---

[6] The jury also found Piatnitsky guilty of assault in the first degree, based upon the shooting of Manchester. However, that conviction was thereafter vacated. Because the assault conviction was based upon the same incident for which the jury convicted Piatnitsky of attempted murder in the first degree, sentencing Piatnitsky for both crimes would have violated principles of double jeopardy.

Counsel referred to Piatnitsky's statements to police that he did not "want to talk right now" and asserted that the detectives "didn't give [Piatnitsky] the right" to write the statement in his own words. Counsel concluded that Piatnitsky's waiver was not made "knowingly and voluntarily" and requested that the trial court exclude both the written and audio-recorded statements.

¶33 On appeal, Piatnitsky's rationale for suppression has shifted. Piatnitsky does not contend on appeal that his purported traumatized state precluded a valid waiver of his rights. Piatnitsky does not challenge the trial court's findings that he was advised of his rights prior to arriving at the precinct, that he acknowledged to Detectives Keller and Allen that he had been so advised, and that he acknowledged to the detectives that he understood those rights. Nor does he challenge the finding that, approximately 45 minutes later, he agreed to give an audio-recorded statement about the shooting. Piatnitsky additionally admits that Detective Keller again advised him of his rights and that Piatnitsky again acknowledged that he understood those rights. Piatnitsky similarly admits that he signed a waiver form indicating that he both understood and agreed to waive his rights and reviewed and signed the written statement thereafter taken by the detectives.

¶34 On appeal, Piatnitsky assigns error to only three determinations made by the trial court following the suppression hearing. First, he contends that the trial court erred by finding that "[a]t no time prior to the conclusion of the interview did the defendant . . . state that he desired to remain silent." Second, Piatnitsky asserts that the trial court erred by omitting from its findings of fact that he stated during the audio-recorded interview, "I don't want to talk right now, man." Finally, Piatnitsky assigns error to the trial court's conclusion that "[t]he context of the recorded statement clearly indicates that the defendant was willing to speak with the detectives, just not on tape."

¶35 In briefing on appeal, appellate counsel for Piatnitsky does not contend that Piatnitsky did not knowingly,

intelligently, and voluntarily waive his rights prior to the interview by Detectives Keller and Allen. Rather, counsel asserts that Piatnitsky thereafter unequivocally invoked his right to remain silent when, during the audio-recorded interview, Piatnitsky purportedly stated, "I don't want to talk right now, man."[7] Counsel's briefing contends that the audiotape of the interview demonstrates that Piatnitsky made this statement in response to Detective Keller's question, "So you'd rather take a written statement, do a written one[?]" Counsel further asserts that the "somewhat muffled" statement was mischaracterized in the transcription of the interview, in which the statement is transcribed as "Yes. I don't know (unintelligible)." Piatnitsky's counsel contends that the trial court erred by relying on the transcription of the interview rather than the audio-recorded interview itself.

¶36 Discussion at oral argument shifted the focus of Piatnitsky's challenge once more, with defense counsel asserting that other statements made by Piatnitsky during the audio-recorded interview—not only the unclear statement transcribed as unintelligible—were sufficient to constitute an unequivocal invocation of his right to remain silent. Based upon oral argument, we will not confine our consideration to only whether Piatnitsky invoked that right during the two-second statement deemed "unintelligible" in the transcription of the interview. Rather, we will also consider Piatnitsky's other statements made during the audio-recorded interview—including his statement, "I'm not ready to do this, man" and his statement, "I just write it down, man. I can't do this. I, I, I just write, man. I don't, I don't want . . . I don't want to talk right now, man"—in determining whether the trial court properly admitted at trial Piatnitsky's subsequent written statement, in addition to his other statements to the detectives.

---

[7] *See* Reply Br. of Appellant at 6 ("[A]*t that point*, the officers were required to cease the interrogation.").

¶37 Thus, the issue before us is whether the trial court erroneously denied Piatnitsky's motion to suppress the written statement given to detectives because, as he asserts, he had unequivocally invoked his right to remain silent prior to providing that statement.

## III

 ¶38 The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." To assure that an accused is accorded this privilege against compulsory self-incrimination, the United States Supreme Court in *Miranda* set forth procedural safeguards to be employed during custodial interrogation: "In order to combat [the compelling] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467. Specifically, an accused must be clearly informed of his or her right to remain silent and right to counsel, either retained or appointed, and that any statements made can and will be used against the individual in court. *Miranda*, 384 U.S. at 467-72. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. After an accused is apprised of his or her rights and given the opportunity to invoke those rights, however, he or she "may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. The requisite warnings and showing of waiver are "prerequisites to the admissibility of any statement made by a defendant." *Miranda*, 384 U.S. at 476.

¶39 The "critical safeguard" ensuring that an accused's right to remain silent is protected is the " 'right to cut off questioning.' " *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. at 474). "The requirement that law enforcement authorities must respect a person's exercise of [the] option [to cut off questioning] counteracts the coercive pressures of the custodial setting." *Mosley*, 423 U.S. at 104. Thus, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Mosley*, 423 U.S. at 104 (quoting *Miranda*, 384 U.S. at 474, 479).

¶40 Of course, whether law enforcement officials were required to cease interrogation of an accused, following the accused's valid waiver of rights, depends upon " 'whether the accused *actually invoked* his right [to remain silent or] to counsel.' " *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (quoting *Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984)). In other words, law enforcement officials are required to "scrupulously honor" an accused's "right to cut off questioning"—such that the failure to do so precludes admission of the accused's statements at trial—only where the accused has actually asserted that right. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." *Davis*, 512 U.S. at 458-59.

¶41 An accused's invocation of either the right to remain silent or the right to counsel must be unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (noting that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*"); *Davis*, 512 U.S. at 458-59 (holding that an accused must unambiguously invoke the right to counsel). Consistent

with this precedent, Washington courts have determined in numerous cases that an accused's invocation of his or her rights was equivocal and, thus, did not require the cessation of interrogation by law enforcement officials. *See, e.g., State v. Radcliffe*, 164 Wn.2d 900, 907, 194 P.3d 250 (2008) (holding that suspect's statement " '[M]aybe [I] should contact an attorney' " was an equivocal request for an attorney and, thus, police were not required to cease the interrogation (alterations in original)); *State v. Walker*, 129 Wn. App. 258, 273-74, 118 P.3d 935 (2005) (holding that suspect's repeated statements that he did not want to incriminate himself, while continuing to speak with detectives for many hours, did not constitute an unequivocal invocation of his right to remain silent).

¶42 "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an assertion of his rights]." *Davis*, 512 U.S. at 459 (citation omitted) (quoting *Davis*, 512 U.S. at 476 (Souter, J., concurring in judgment)). Where an accused makes an ambiguous or equivocal statement regarding the invocation of his or her rights, law enforcement officers have no obligation to ask clarifying questions or to cease the interrogation. *Berghuis*, 560 U.S. at 381; *Davis*, 512 U.S. at 461-62. The Supreme Court has determined that requiring officers to cease interrogation where a suspect makes a statement that *might* be an invocation of his or her rights would create an unacceptable hindrance to effective law enforcement. *Davis*, 512 U.S. at 461. "There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Berghuis*, 560 U.S. at 381 (alterations in original) (quoting *Davis*, 512 U.S. at 458-59). The "bright

line" rule requiring officers to cease interrogation where a suspect invokes his or her rights "can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." *Davis*, 512 U.S. at 461. This "clarity and ease of application would be lost" were officers required to cease questioning in response to ambiguous statements of the accused regarding his or her rights. *Davis*, 512 U.S. at 461. Thus, following a valid waiver of rights, a defendant's statements to police are properly suppressed for violation of the privilege against self-incrimination only where police continued a custodial interrogation notwithstanding an accused's unequivocal assertion of his or her rights. *See Berghuis*, 560 U.S. at 381-82; *Davis*, 512 U.S. at 462.

■■ ¶43 The Supreme Court has additionally provided guidance regarding that which constitutes such an assertion of rights: an accused's statement is an unequivocal invocation of his or her rights where that statement is sufficiently clear that "a reasonable police officer in the circumstances" would understand it to be such an assertion. *Davis*, 512 U.S. at 459. Although the invocation must be unequivocal, an accused "need not rely on talismanic phrases or 'any special combination of words' " in order to invoke his or her rights. *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (quoting *Quinn v. United States*, 349 U.S. 155, 162, 75 S. Ct. 668, 99 L. Ed. 964 (1955)). Because no such "magic words" are required in order to invoke one's rights—and because a purported invocation is analyzed from the point of view of a reasonable police officer in the circumstances—a trial court "should examine 'the entire context in which the claimant spoke' to determine if the right to remain silent has been invoked." *Bradley*, 918 F.2d at 342 (quoting *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972)); *accord United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) ("We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain

216

silent."); *Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir. 1992); *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989) (rejecting the defendant's assertion that it is improper to analyze the scope of an accused's statements in determining whether he invoked his rights); *People v. Arroya*, 988 P.2d 1124, 1131 (Colo. 1999) ("[B]efore the police must scrupulously honor a suspect's right to remain silent, the suspect must clearly articulate that right so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect wants to exercise his right to cut off further questioning."); *State v. Rowell*, 476 So. 2d 149, 150 (Fla. 1985); *State v. Diaz-Bridges*, 208 N.J. 544, 564-65, 34 A.3d 748 (2012). Indeed, we have previously recognized that a trial court should consider the totality of the circumstances when determining whether an accused unequivocally invoked his or her rights. *State v. Hodges*, 118 Wn. App. 668, 671, 77 P.3d 375 (2003) ("[T]he right to remain silent can be invoked by remaining silent when, under the totality of the circumstances, the invocation is clear and unequivocal.").

¶44 Thus, the context of an accused's statements to police—including the accused's behavior and the scope of the accused's statements—must be considered in determining whether the accused invoked his or her rights. Any other approach—such as a search for "magic words" within an accused's utterances to police in an effort to determine whether rights were invoked—is at odds with the Supreme Court's indication that such an analysis must be made from the point of view of a reasonable officer "in the circumstances." *See Davis*, 512 U.S. at 459. Furthermore, such an approach would not effectively fulfill the purpose of *Miranda*—" 'to assure that *the individual's right to choose* between speech and silence remains unfettered throughout the interrogation process.' " *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987) (quoting *Miranda*, 384 U.S. at 469). Examining the context of an accused's statements to police allows the trial court to more

accurately determine whether the accused sought to assert his or her rights. Moreover, such an approach enables the accused to exercise his or her right to choose whether to provide a statement to police: precluding the admission of an accused's statements based solely upon the utterance of "magic words" would be improper where the circumstances of the interrogation demonstrated that the accused did, in fact, voluntarily choose to convey information to law enforcement.

¶45 Indeed, the Supreme Court has emphasized the importance of determining an accused's actual wishes—whether or not to convey information to police—when assessing whether the accused has invoked his or her rights. In *Barrett*, the Court relied upon the purpose of *Miranda* in determining that an accused could invoke his Fifth Amendment right to counsel for limited purposes only, such that law enforcement officials were not obligated to cease questioning so long as they respected that limited invocation. 479 U.S. 523. There, Barrett was advised of his *Miranda* rights and signed an acknowledgement form indicating such. *Barrett*, 479 U.S. at 525. He told police that he understood his rights and that "he would not give a written statement unless his attorney was present but had 'no problem' talking about the incident." *Barrett*, 479 U.S. at 525. Barrett later sought to suppress the inculpatory statements that he thereafter made to police. *Barrett*, 479 U.S. at 526. The trial court admitted Barrett's statements. The Connecticut Supreme Court reversed, holding that, by stating that he would not give a written statement without the presence of attorney, Barrett had invoked his right to counsel for all purposes, thus rendering any subsequent statements inadmissible. *Barrett*, 479 U.S. at 526-27.

¶46 The United States Supreme Court disagreed, noting that "[n]othing in [its] decisions, . . . or in the rationale of *Miranda*, requires authorities to ignore the tenor or sense of a defendant's response to [*Miranda*] warnings." *Barrett*, 479 U.S. at 528. The Court reasoned that the prohibition on

further questioning of an accused who has asserted the right to counsel "is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." *Barrett*, 479 U.S. at 528. Noting that the "fundamental purpose" of *Miranda* is to limit the coercive pressures of the custodial setting such that an accused speaks to police only of his or her own volition, the Court concluded that "no constitutional objective . . . would be served by suppression in [that] case." *Barrett*, 479 U.S. at 528-29.

¶47 Although Barrett desired the presence of counsel prior to making a written statement, no such statement was obtained. Furthermore, "Barrett's limited requests for counsel . . . were accompanied by affirmative announcements of his willingness to speak with the authorities." *Barrett*, 479 U.S. at 529. Thus, the Court determined that the admission of Barrett's statements was not contrary to the constitutional protections afforded him by *Miranda*: "The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment. *Miranda* gives the defendant a right to choose between speech and silence, and Barrett chose to speak." *Barrett*, 479 U.S. at 529.

¶48 Nor is consideration of the circumstances surrounding an accused's statements to police synonymous with using an accused's postinvocation responses to further interrogation to "cast doubt on the clarity" on the accused's assertion of his or her rights. *Smith*, 469 U.S. at 92. In *Smith*, the Supreme Court reversed the Illinois Supreme Court's decision that an accused's statements to police were ambiguous and, thus, did not constitute an unequivocal assertion of his right to counsel. 469 U.S. at 92. There, while advising Smith of his *Miranda* rights, the interviewing officer asked Smith if he understood his right to counsel. *Smith*, 469 U.S. at 93. Smith replied, " '*Uh, yeah. I'd like to do that.*' " *Smith*, 469 U.S. at 93. Nevertheless, the officer continued to interrogate Smith, eliciting statements that

implicated Smith in the robbery under investigation. *Smith*, 469 U.S. at 93. The Illinois Appellate Court acknowledged that Smith's request for counsel " 'appears clear and unequivocal' " but concluded that, when considering Smith's other statements, it became clear that he was " 'undecided about exercising his right to counsel.' " *Smith*, 469 U.S. at 94 (quoting *People v. Smith*, 113 Ill. App. 3d 305, 309-10, 447 N.E.2d 556, 69 Ill. Dec. 339 (1983)). The Illinois Supreme Court affirmed, concluding that in light of Smith's later remarks to the officer, he did not effectively invoke his right to counsel by stating, " *'Uh, yeah. I'd like to do that.'* " *Smith*, 469 U.S. at 93-94.

¶49 The United States Supreme Court rejected this retroactive approach to determining whether an accused invoked his or her rights. *Smith*, 469 U.S. at 97-98. The Court noted that "[t]he courts below were able to construe Smith's request for counsel as 'ambiguous' *only* by looking to Smith's *subsequent* responses to continued police questioning and by concluding that, 'considered in total,' Smith's *'statements'* were equivocal." *Smith*, 469 U.S. at 97 (quoting *People v. Smith*, 102 Ill. App. 2d 365, 373, 466 N.E.2d 236, 80 Ill. Dec. 784 (1984)). The Court held that

> [w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

*Smith*, 469 U.S. at 98. The Court was careful to note, however, that its decision was "a narrow one":

> We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such ambiguity or equivocation. We hold only that, under the clear logical force of settled precedent, an

accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

*Smith*, 469 U.S. at 99-100.[8]

¶50 Thus, Supreme Court precedent controls the determination of whether an accused, following a valid waiver of rights, thereafter invoked his or her rights to remain silent or to counsel, thus rendering any subsequently obtained statements inadmissible at trial. The invocation must be unequivocal, such that a "reasonable police officer in the circumstances" would understand it to be an assertion of the accused's rights. *Davis*, 512 U.S. at 459; *see also Berghuis*, 560 U.S. at 381-82. Moreover, the prohibition on further questioning of an accused who has invoked his or her rights is "justified only by reference to its prophylactic purpose"—that purpose being the preclusion of admitting against the accused compulsory statements made to law enforcement officials. *Barrett*, 479 U.S. at 528. Ignoring the "tenor or sense of a defendant's responses to [*Miranda*] warnings" is inconsistent with determining the accused's wishes with regard to conveying information to police; thus, doing so fails to advance the "fundamental purpose" of *Miranda*—ensuring that the coercive pressures of custodial interrogation are limited such that any statements to police are made of the accused's own volition. *Barrett*, 479 U.S. at 528. We adhere to each of these principles in reviewing the trial court's rulings herein.

---

[8] Of course, the Court would later hold, in *Davis* and *Berghuis*, that the "consequences of such ambiguity or equivocation," *Smith*, 469 U.S. at 99-100, include a determination that the accused did not invoke his or her rights and, thus, that the statements thereafter made to the police are admissible evidence against the accused.

In addition, we note that, in his concurrence in *Davis*, Justice Souter shed light on the Court's opinion in *Smith*, explaining that the Court did not therein "suggest[ ] that particular statements should be considered in isolation." 512 U.S. at 473 (Souter, J., concurring in judgment).

## IV

¶51 Piatnitsky contends that he unequivocally invoked his right to remain silent during the audio-recorded interview with detectives, thus rendering his subsequent written statement inadmissible at trial.[9] As the trial court found, the context of Piatnitsky's statements to police indicates that he wished to convey his version of events to the detectives, although he did not want to do so on audiotape. Such is inconsistent with an unequivocal assertion of the right to remain silent. Thus, the trial court properly admitted Piatnitsky's written statement.

¶52 The admissibility of a defendant's statements to police during a custodial interrogation is governed by CrR 3.5. "[T]he rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); *see also State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (holding that decisions to the contrary are "overruled insofar as they are inconsistent"). Our Supreme Court has determined that this standard provides " 'adequate opportunity for review of trial court findings within the ordinary bounds of review' " and " 'strikes the proper balance between protecting the rights of the defendant, constitutional or otherwise, and according deference to the factual determinations of the actual trier of fact.' " *Broadaway*, 133 Wn.2d at 131 (quoting *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994)). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *Hill*, 123 Wn.2d at 644. After review-

---

[9] As explained above, Piatnitsky does not contend on appeal that his statements were improperly admitted because he had not voluntarily waived his rights. Rather, his assertion is that, subsequent to waiving his rights, he thereafter unequivocally invoked his right to remain silent.

ing whether the trial court's findings are supported by substantial evidence, we make "a de novo determination of whether the trial court derived proper conclusions of law from those findings." *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997); *accord Broadaway*, 133 Wn.2d at 131; *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008); *State v. Hughes*, 118 Wn. App. 713, 722, 77 P.3d 681 (2003). Credibility determinations are the province of the trial court and will not be disturbed on appeal. *State v. Radcliffe*, 139 Wn. App. 214, 220, 159 P.3d 486 (2007), *aff'd*, 164 Wn.2d 900.

¶53 Piatnitsky challenges the trial court's factual finding that "[a]t no time prior to the conclusion of the interview did the defendant . . . state that he desired to remain silent."[10] Substantial evidence supports this finding. First, the uncontroverted testimony of Detectives Keller and Allen was that Piatnitsky at no time prior to the audio-recorded interview stated that he did not want to speak with them; rather, both detectives testified that Piatnitsky conveyed that he was willing to give a statement.[11] With regard to Piatnitsky's statements during the audio-recorded interview, both detectives testified that Piatnitsky indicated that he no longer wanted to give an audio-recorded statement but that he did want to give a written statement. As Detective Keller testified, "For some reason [Piatnitsky]

---

[10] As explained above, in briefing on appeal, Piatnitsky points only to the two-second statement made during the audio-recorded interview that was transcribed as "unintelligible." However, during oral argument, defense counsel asserted that Piatnitsky's earlier statements—specifically, the statement "I just write it down, man. I can't do this. I, I, I just write, man. I don't, I don't want . . . I don't want to talk right now, man"—constitute an invocation. Accordingly, we consider all of the statements made by Piatnitsky during the audio-recorded interview in determining whether he unequivocally invoked his right to remain silent.

[11] Although the trial court thoroughly advised Piatnitsky of his right to testify at the CrR 3.5 hearing, and although he later testified at trial, Piatnitsky did not testify at the suppression hearing. The detectives' testimony at the hearing was the only evidence presented on the issues.

didn't feel comfortable on tape, but he said multiple times that he did want to give a written statement."

¶54 Moreover, the audiotape and the transcript of the audio-recorded interview, both of which the trial court considered at the CrR 3.5 hearing, demonstrate that Piatnitsky at no time during that interview stated that he did not want to convey information to the detectives.[12] Piatnitsky stated, "I'm not ready to do this, man. . . . I just write it down, man. I can't do this. I, I, I just write, man. I don't, I don't want . . . I don't want to talk right now, man." Then, Piatnitsky conveyed agreement with Detective Keller's statement, "Okay, but let's go over the rights on tape, and then you can write it down, okay"—Piatnitsky replied, "All right, man." Later, Detective Allen asked Piatnitsky, "Are you sure you don't want to do it on tape like you said you did; you want to get [it] in your own words?" Piatnitsky replied, "Yes, sir." Detective Keller then said, "So you'd rather take a written statement, do a written one." Piatnitsky's reply—transcribed as "Yes. I don't know (unintelligible)"—was muffled.[13] Detective Keller then stated, "Okay, it's too hard to talk about; you'd rather write it." Piatnitsky did not reply.

¶55 An accused's statements constitute an unequivocal assertion of the right to remain silent only where they are sufficiently clear such that "a reasonable police officer in the circumstances" would understand the statements to be an assertion of that right. *Davis*, 512 U.S. at 459. Here, the

---

[12] Piatnitsky asserts on appeal that the trial court improperly considered only the transcript of the audio-recorded interview, rather than the audiotape of the interview itself. This assertion is not supported by the record.

[13] The audiotape of the interview is included in the record on appeal. Based upon our review of the audiotape, it may be that Piatnitsky stated, "Yeah . . . I don't really wanna feel like talkin' man." Because Piatnitsky's statements to detectives and the context of those statements indicate that he did not unequivocally assert his right to remain silent, the precise language used by Piatnitsky during this muffled statement is not of significance. Moreover, we note that such a muffled statement, absent circumstances indicating otherwise, is unlikely to constitute an unequivocal invocation of the right to remain silent, simply by virtue of its lack of clarity.

detectives believed that Piatnitsky wished to give a state-
ment (albeit not on audiotape), thus indicating that Piat-
nitsky's statements were not sufficiently clear to constitute
an unequivocal assertion of his right to remain silent. The
trial court determined that Piatnitsky's statements were
not an invocation of his right to remain silent but, rather,
were intended to convey that he no longer wished to give an
audio-recorded statement. The trial court was not required
to "ignore the tenor or sense" of Piatnitsky's statements in
determining whether he had invoked that right; nor are we.
*Barrett*, 479 U.S. at 528. Rather, the trial court properly
"examine[d] 'the entire context' " of Piatnitsky's statements
in determining whether such an invocation had occurred.
*Bradley*, 918 F.2d at 342 (quoting *Goodwin*, 470 F.2d at 902).

¶56 Considering the circumstances surrounding Piat-
nitsky's statements—as the trial court properly did and as
we must—it is apparent that the facts support the trial
court's conclusion that "[t]he context of the recorded state-
ment clearly indicates that [Piatnitsky] was willing to
speak with the detectives, just not on tape." According to the
uncontradicted testimony of the detectives, Piatnitsky
never stated prior to the audio-recorded interview that he
did not want to speak with them; rather, they testified,
Piatnitsky indicated prior to that interview that he wanted
to give a statement "in his own words" on audiotape. Then,
apparently changing his mind about the wisdom of discuss-
ing his version of events on audiotape, Piatnitsky stated,
during the audio-recorded interview, that he would "just
write it down, man." His statement made immediately
thereafter—"I don't want to talk right now, man"—is con-
sistent with his previously asserted desire to "just write it
down." Once the audiotape was turned off, as Piatnitsky
requested, Piatnitsky participated fully in the taking of the
written statement, telling the detectives precisely what to
write down and making several changes to the statement of
his own accord.

¶57 Piatnitsky nevertheless contends that our decision in *State v. Rosas Gutierrez*, 50 Wn. App. 583, 749 P.2d 213 (1988), requires reversal of his convictions. There, the State elicited at trial testimony regarding the defendant's assertion of his right to remain silent following his arrest. *Gutierrez*, 50 Wn. App. at 588. Upon discovering narcotics in a storage unit, detectives had asked the defendant to comment; the defendant replied, " 'I would rather not talk about it.' " *Gutierrez*, 50 Wn. App. at 588. The State implied at trial that the defendant's invocation of his right to remain silent indicated that he was aware of the narcotics. *Gutierrez*, 50 Wn. App. at 588-89. We held that the defendant's statement was "an unequivocal assertion of his right to remain silent" and that testimony concerning that statement violated the defendant's right against self-incrimination. *Gutierrez*, 50 Wn. App. at 589.

¶58 Piatnitsky asserts that his statements to the detectives—either "I don't want to talk right now, man" or "I don't really feel like talking, man"[14]—necessarily constitute an unequivocal assertion of his right to remain silent based upon our determination that Gutierrez's statement—"I would rather not talk about it"—was such an assertion. Piatnitsky fails to consider, however, that the circumstances surrounding the statements made must be taken into account in order to determine whether he expressed an unequivocal desire to cease communicating with law enforcement officers. In *Gutierrez*, the statement, given its context, clearly indicated that the defendant did not wish to convey information to police. *See* 50 Wn. App. at 588. Here, in contrast, Piatnitsky's request to refrain from giving a statement on audiotape was "accompanied by affirmative announcements of his willingness" to give a written statement. *Barrett*, 479 U.S. at 529. Here, as in *Barrett*, "[t]he fact that officials took the opportunity provided by [the accused]

---

[14] Piatnitsky contends that the statement transcribed as "Yes. I don't know (unintelligible)" was actually "I don't really feel like talking, man." Appellant's Br. at 8.

to obtain a[ ] . . . confession is quite consistent with the Fifth Amendment. *Miranda* gives the defendant a right to choose between speech and silence, and [Piatnitsky] chose to speak." *Barrett*, 479 U.S. at 529.

¶59 Moreover, the proposition that a purported invocation of rights is to be broadly construed is unavailing here:

> Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous. Here, however, [Piatnitsky] made clear his intentions, and they were honored by police. To conclude that [Piatnitsky] invoked his right [to remain silent in all respects] requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [his] statement.

*Barrett*, 479 U.S. at 529-30. This explication supports the trial court's conclusion that Piatnitsky indicated that he "was willing to speak with the detectives, just not on tape"—the ordinary meaning of Piatnitsky's statements to police indicate that he wished to convey his version of the events, although not on audiotape. The detectives honored that request—they turned off the audiotape and took a written statement instead.[15]

¶60 Furthermore, that Piatnitsky chose not to speak on audiotape is of no moment to the determination of whether his written statement was given voluntarily. "It is well-established . . . that a suspect does not invoke his or her right to remain silent merely by refusing to allow the tape recording of an interview, unless that refusal is accompanied by other circumstances disclosing a clear intent to speak privately and in confidence to others." *People v. Samayoa*, 15 Cal. 4th 795, 829-30, 938 P.2d 2, 64 Cal. Rptr. 2d 400 (1997) (citing *People v. Johnson*, 6 Cal. 4th 1, 25-26, 859 P.2d 673, 23 Cal. Rptr. 2d 593 (1993)). In *Samayoa*, the court determined that the accused's "no tape recording"

---

[15] We need not—and, therefore, do not—address whether an audio-recorded statement would have been admissible had the detectives decided not to honor Piatnitsky's request to stop the audio recording. Such are not the facts of this case.

remark, which followed an explicit waiver of rights and was immediately followed by incriminating admissions, was "not inconsistent with a willingness to discuss the case freely and completely." 15 Cal. 4th at 830. Other courts have agreed. *See, e.g., Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001) (holding that a request that the detective turn off a tape recorder does not constitute an unequivocal invocation of the right to remain silent); *State v. Graham*, 135 Ariz. 209, 210-11, 660 P.2d 460 (1983) (determining that accused's statement " 'I ain't gonna say it on that,' " referring to a tape recorder, was not an invocation of the right to remain silent).[16]

¶61 The uncontroverted testimony of the detectives and the audio-recorded interview indicate that, although Piatnitsky desired not to give a statement on audiotape, he was willing to give the detectives a written statement. Considering the context of his statements, it is apparent that Piatnitsky did not unequivocally invoke his right to remain silent. Because Piatnitsky explicitly waived his rights and did not thereafter invoke those rights, the trial court properly declined to suppress Piatnitsky's inculpatory statements to detectives.

¶62 The Fifth Amendment protects the accused from compulsory self-incrimination. Here, Piatnitsky willingly provided a written statement to the detectives. "[W]e know of no constitutional objective that would be served by suppression in this case." *Barrett*, 479 U.S. at 529.

---

[16] Piatnitsky does not contend that the distinction that he made between giving an audio-recorded statement and a written statement "indicates an understanding of the consequences so incomplete" that his request to give a nonrecorded statement should be deemed an invocation of his right to refrain from giving a statement in any manner. *Barrett*, 479 U.S. at 530. However, we note that the Supreme Court has already rejected such a proposition, concluding that "[t]he fact that some might find [an accused's] decision illogical is irrelevant, for we have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.' " *Barrett*, 479 U.S. at 530 (footnote omitted) (quoting *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)).

V

¶63 Although our review of the case law has been exhaustive, we recognize that, ultimately, our role in reviewing the trial court's ruling is rather constrained. Holding that there is no basis in Washington law "for a principle of independent review of the record in a confession case," our Supreme Court has defined our limited role in reviewing such trial court rulings: "[T]he rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." *Broadaway*, 133 Wn.2d at 131. Where the trial court's findings of fact—both those unchallenged on appeal and those supported by substantial evidence in the record—support its conclusions of law, we uphold the trial court's conclusions. *Armenta*, 134 Wn.2d at 9; *accord Broadaway*, 133 Wn.2d at 131; *Grogan*, 147 Wn. App. at 516; *Hughes*, 118 Wn. App. at 722.

¶64 Piatnitsky does not challenge the trial court's findings that he was advised of his rights, conveyed to the interviewing detectives that he understood his rights, and thereafter voluntarily waived those rights. Thus, these unchallenged findings are verities on appeal. Piatnitsky assigns error to only one finding of fact—that he "[a]t no time prior to the conclusion of the interview . . . state[d] that he desired to remain silent." But substantial evidence in the record, consisting of both the detectives' testimony and the audio-recorded interview itself, supports this finding. Collectively, these findings amply support the trial court's conclusion that Piatnitsky "was willing to speak with the detectives, just not on tape," and, thus, that Piatnitsky's inculpatory written statement was uncoerced and admissible at trial.

## VI

■ ¶65 Piatnitsky additionally contends that his right to due process was violated because the "to convict" instruction on the charge of attempted murder in the first degree did not include premeditation as an element of that crime. He is incorrect. *State v. Besabe*, 166 Wn. App. 872, 883, 271 P.3d 387 (2012), *petition for review filed*, No. 87383-6 (Wash. May 17, 2012); *accord State v. Reed*, 150 Wn. App. 761, 208 P.3d 1274 (2009).

¶66 Affirmed.

LEACH, C.J., concurs.

¶67 BECKER, J. (dissenting) — Detectives tried to get appellant Samuel Piatnitsky to sign a waiver of rights so that they could take a statement from him about a killing. Piatnitsky said, "I don't want to talk right now, man." The majority accepts the trial court's conclusion that Piatnitsky's statement, taken in context, indicated that he was willing to talk. In my view, Piatnitsky unequivocally invoked his right to remain silent. The motion to suppress should have been granted. The error was not harmless. I respectfully dissent.

¶68 Piatnitsky was advised of his *Miranda*[17] rights before any interrogation began. Detectives questioned Piatnitsky for an hour off the record until he agreed to give a tape recorded statement. When the recording began, Piatnitsky was again advised of his *Miranda* rights. He said, "I'm not ready to do this, man." A detective reminded Piatnitsky that he had previously said he wanted to get his version on tape, in his own words. Piatnitsky responded, "I just write it down, man . . . . I don't want to talk right now, man."

---

[17] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶69 When Piatnitsky said, "I don't want to talk right now, man," he unequivocally invoked his right to silence. Questioning should have ceased. Instead, Detective Keller continued, "Okay, but let's go over the rights on tape, and then you can write it down, okay." But the officers had no intention of letting Piatnitsky take pen in hand to write a statement.[18] They wanted to ask questions, get answers, and then write up a statement for Piatnitsky to sign. And that is exactly what happened. The detectives went over the rights on tape, obtained Piatnitsky's signature on a waiver of his constitutional rights, and tried one more time to get him to talk on tape. Piatnitsky declined. Detective Keller paraphrased, "Okay, it's too hard to talk about; you'd rather write it." Then the detectives turned off the audiotape, questioned Piatnitsky about the homicide, used his answers to write up a statement, and obtained his signature on the statement. The fact that the officers gave Piatnitsky the opportunity to review the written statement and make changes in it does not overcome the fact that they obtained the statement by getting Piatnitsky to talk right after he said he did not want to talk.

¶70 Piatnitsky challenges the finding that "at no time prior to the conclusion of the interview did the defendant . . . state that he desired to remain silent."[19] The majority defends this finding as supported by the context of the recorded statement. The finding is supported only if it was reasonable for the officers to decide that what Piatnitsky really meant to say was "I don't want to talk while the tape is running." The majority does not cite authority for giving "such an elaborate contextual interpretation" to words as plain as Piatnitsky's. *State v. Nysta*, 168 Wn. App, 30, 42, 275 P.3d 1162 (2012), *petition for review filed*, No. 87491-3

---

[18] See the trial court's conclusion of law (c): "The detectives' explanation that they do not normally allow suspects to write their own statement because they need it to be legible is reasonable and a common practice of law enforcement." Clerk's Papers at 315.

[19] Clerk's Papers at 313.

(Wash. June 14, 2012). In *State v. Rosas Gutierrez*, 50 Wn. App. 583, 588, 749 P.2d 213, *review denied*, 110 Wn.2d 1032 (1988), during a post-*Miranda* interrogation, the defendant said, "I would rather not talk about it." We referred to this as "a simple statement" asserting the right to remain silent. *Gutierrez*, 50 Wn. App. at 588-89. The same is true of "I don't want to talk right now, man."

¶71 In contract law, we interpret what was written, not what was intended to be written. *Hearst Commc'ns, Inc., v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005). The standard in criminal law should be no less. Heretofore, cases allowing the use of context to interpret a suspect's response to an attempt at interrogation have been limited to those situations where the defendant uses equivocating words such as "maybe," "perhaps," and "if." *See State v. Pierce*, 169 Wn. App. 533, 546-47, 280 P.3d 1158 (2012), *petition for review filed*, No. 87766-1 (Wash. Aug. 17, 2012), and cases cited therein. Piatnitsky did not use words of that nature.

¶72 The majority's elastic use of context as a tool of interpretation goes far beyond what was done in the cases the majority relies on. For example, in *Connecticut v. Barrett*, 479 U.S. 523, 525, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987), the defendant made it quite clear that he was willing to talk, though he would not give a *written* statement unless his attorney was present. In *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972), *cert. denied*, 411 U.S. 969 (1973), the court held that the motion to suppress should have been *granted*, noting that it was "axiomatic that a waiver of constitutional rights is not lightly to be implied." In *People v. Arroya*, 988 P.2d 1124, 1133-34 (Colo. 1999), the court affirmed a trial court's ruling that "I don't wanna talk no more" was a clear invocation of the right to remain silent. In *Bradley v. Meachum*, 918 F.2d 338, 342, 343 (1990), *cert. denied*, 501 U.S. 1221 (1991), as part of "an ongoing stream of speech," the defendant told detectives that he "was not going to say whether he was involved in

the crime," but the court did not regard it as an invocation of the right to silence because "in the same breath," he denied any involvement. Piatnitsky, by contrast, did not begin to discuss his involvement or lack thereof. The officers nevertheless insisted that he cooperate with their desire to conduct an interrogation. The majority emphasizes that Piatnitsky did cooperate once the audiotape was turned off. But his participation at that point, after he said, "I don't want to talk right now, man" and received the "Okay, but . . ." response, cannot be used as context to "cast retrospective doubt" on the clarity of his invocation of the right to remain silent. *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

¶73 As the majority recognizes, there are no talismanic phrases a suspect must use to invoke the right to remain silent. Majority at 215. The majority then turns this principle in favor of the State by holding it is improper to preclude admission of a statement "based solely upon the utterance of 'magic words.'" Majority at 217. If by "magic words," the majority means plain language that a reasonable officer should recognize as an invocation of the right to silence, then that is the correct analytical approach under *Miranda*. "I don't want to talk right now, man" was plain language that should have caused the detectives to stop questioning Piatnitsky, regardless of the fact that he earlier seemed to be willing to talk. To tolerate the trial court's reinterpretation of the defendant's remark in this case waters down the protection of *Miranda* to the point where it is illusory.

¶74 Piatnitsky had alleged self-defense, and the jury was instructed on lesser-included offenses. In the statement produced by the interrogation, Piatnitsky admitted that he fired one or two shots at the victim and that the victim was "trying to scurry away" at the time. The written statement was read by a detective for the jury and emphasized during closing argument by the prosecutor. The illegally obtained statement made it easier for the jury to reject Piatnitsky's

claim of self-defense and conclude he was guilty of murder. Given these circumstances, the error was not harmless. I would reverse and remand for a new trial.

Review granted at 176 Wn.2d 1022 (2013).