**Lann D. CARLISLE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2008–CA–001531–MR.

Court of Appeals of Kentucky.

July 16, 2010.

H. Randall Redding, Henderson, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Michael L. Harned, Assistant Attorney General, Frankfort, KY, for appellee.

Before ACREE and CLAYTON, Judges; HARRIS,[1] Senior Judge.

---

1. Senior Judge William R. Harris sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statute 21.580.

## OPINION

ACREE, Judge:

Lann D. Carlisle appeals the Henderson Circuit Court's denial of his motion to suppress his confession given during a custodial interrogation. Because we find that the police officers involved did not scrupulously honor Carlisle's invocation of his right to remain silent, we reverse and remand for additional proceedings.

### Facts and Procedure

On November 6, 2007, Detective Brian Trimborn confronted Carlisle at his grandmother's home regarding allegations he had raped his stepdaughter. Carlisle was transported to the police station for interrogation in a police vehicle.[2] In the interrogation room, Detective Trimborn provided Carlisle with a written statement of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The detective ascertained that Carlisle understood his rights. He then proceeded to question Carlisle regarding his stepdaughter's allegations.

For approximately an hour and a half, Carlisle wholly denied the rape and maintained his innocence despite Detective Trimborn's insistence that he admit to raping his stepdaughter so he could "help [him]self."

Because this case turns on the application of the law to the circumstances surrounding Carlisle's interrogation, it is necessary to set forth much of that interrogation *verbatim*. We begin at the point Carlisle finally and clearly asserted his right to remain silent, approximately an hour and a half after interrogation began.

Carlisle: Well, Brian, I don't want to say no more, okay?

Det. Trimborn: Let me talk to my sergeant for a second. Hang tight. I don't want you to mess yourself up. Just think about it for a few minutes, okay? I'm going to let you sit here and think for a few minutes. I don't know what to tell you, other than you need to help yourself. You really need to help yourself.

Carlisle: Am I under arrest?

Det. Trimborn: I said no. It's as clear as I can be, I said no. Sit here for a few minutes[;] let me talk to my sergeant[.] I'll be right back. Just think about it.

Carlisle: Can I walk outside and smoke a cigarette?

Det. Trimborn: No, you can't smoke a cigarette. Just hang on tight.

Detective Trimborn then left the room.

Carlisle was alone for approximately six-and-one-half minutes when Officer Bradley Newman entered. Carlisle was apparently acquainted with Officer Newman. He did not give new *Miranda* warnings to Carlisle at any point in the conversation during which the following exchange occurred:

Off. Newman: What's up, [Carlisle]?

Carlisle: What ya say, Bradley?

Off. Newman: What are you doing, man?

Carlisle: Oh, I don't know, man.

Off. Newman: What the hell's going on?

Carlisle: You a sergeant now?

Off. Newman: No. No. What the hell's going on, brother?

Carlisle: Well ... I'd rather not say. Of course, you probably already know.

Off. Newman: Know a little bit about it.

Carlisle: Bad situation, [Newman]. Real bad situation.

Off. Newman: Well, what, what, tell me what, what happened, I mean ... or

---

**2.** There has been no assertion on appeal that the interrogation was not custodial; we there-fore need not recite all the facts which lead us to believe it was.

what it's really about[.] I'm just hearing hallway talk right now.

Carlisle: My, my daughter said that I raped her.

Off. Newman: How did you supposedly rape her?

Carlisle: I don't know, I don't know what she's saying. That's just all I know. This detective, [Trimborn], come in here and told me a bunch of stuff, I mean—

Off. Newman: What'd he tell you?

Carlisle: Just told me about what, about hit and miss what, what she said. Now, I don't, I can't really remember right now because I'm in a sto-, uh, state of confusion.

Off. Newman: You work today?

Carlisle: No.

Off. Newman: No?

Carlisle: But I'm supposed to go in tomorrow.

Off. Newman: When'd all this sh* * supposedly happen?

Carlisle: Not last, not last night, night before last. The night that I was supposed to have went to work, Sunday night.

Off. Newman: Now, how would, how would you have raped her? I mean, I don't, I mean, did you hold her down and do something?

Carlisle: Didn't do nothing.

Off. Newman: Well, they sure got you in a pickle right now. You're looking at a long time. And you know I ain't going to bullsh* * you. I mean, you're looking at a long time, L.D. [Carlisle]. Now, I don't know what I can do to help you.

Carlisle: Am I under arrest, Brad?

Off. Newman: Not yet. No. I'm not saying they're not going to, I'm not going to say that they're not going to lock you up, because I don't know. This ain't

got nothing to do with me. I work street crimes, not this. I'm back here, but I don't work stuff like this. But I just come back here to see if there was anything I could do to help you. Because I know, brother, that you don't want to be gone a long time.

At this point, Carlisle asserted his right to consult with an attorney.

Carlisle: I'd rather talk to a lawyer.

Off. Newman: You want to talk to a lawyer?

Carlisle: Yeah.

Off. Newman: So you don't want to answer any more of his questions or anything?

Carlisle: I'd rather not.

Off. Newman: Well, that's your right, man. That's your right. I'll go get with him and see what he wants to do with you, okay? But if there's anything you wanted to tell me, I could see what I could do to help you. But if you just want to talk to an attorney, I'll go ahead and . . . have at it. I'm not going to be able to help you now.

Carlisle: Huh?

Off. Newman: I'm not going to be able to help you in any way now, man. I mean, I've got a good, you know, I work with these guys.

Carlisle: Just, just, just on somebody's word they can—. . . ?

Off. Newman: Every day, every day, man. Every day. That's what we do. I mean, that's where we go[.] [Y]ou've got somebody that says, so and so said they was going to kill me. Well, guess, what, we gotta do a report on it.

Carlisle: I don't understand that.

Off. Newman: I don't understand it half the damn time, but . . .

Carlisle: Am I free to go?

Off. Newman: Not until he comes back in here. Like I said, I don't know what

their intentions are, but I might have been able to help you a little bit, but if you're just, if you don't want to talk to me, I can't, I can't make you talk to me . . . [Pause] . . . you want me to just go get him? You don't want me to try to help you?

Carlisle: I really appreciate it, man, but—

Off. Newman: I tried, man.

Carlisle: What can I say?

Off. Newman: All right.

Officer Newman then left the room.

Soon thereafter, Detective Trimborn and Officer Newman re-entered with paperwork and informed Carlisle he was under arrest. The interrogation continued as follows:

Det. Trimborn: Okay, Lann [Carlisle], I just got off the phone with the prosecutor. You're under arrest. We're going to charge you with rape.

Detective Trimborn then addressed Officer Newman, still in Carlisle's presence.

Det. Trimborn: The prosecutor told me, Brad [Officer Newman], that when I get done with this paperwork, if he ain't said a word to try to help himself, then there will be no deals cut whatsoever. He will give him the maximum sentence in prison as a rapist. Basically, he's calling Lann's [Carlisle's] bluff.

Carlisle: What? So I will be under arrest, right?

Det. Trimborn: You are under arrest. What's your middle initial?

Carlisle: D, for Darrell.

[Trimborn then proceeds to fill out paperwork.]

Det. Trimborn: What is rape, third?

Carlisle: Can we step outside for a few minutes?

Det. Trimborn: Who's that?

Carlisle: Can me and you step outside for a few minutes?

Detective Trimborn agreed to Carlisle's request and the two left the room. The conversation that next took place was not recorded; however, the circuit court concluded Carlisle confessed to committing the rape and that Trimborn neither questioned nor threatened the suspect.[3] Upon reentering the police station, Carlisle confessed to raping his stepdaughter and gave a fairly detailed description of the offense.

Carlisle was indicted on a charge of first-degree rape. He moved to suppress the confession, arguing it had been taken in violation of his right to remain silent and his right to have an attorney present. Following a hearing, the circuit judge denied his motion, and Carlisle entered an *Alford* plea conditioned on his appeal of the denial of his motion to suppress the confession.

Carlisle now argues that the circuit court erred when it concluded his confession was not taken improperly. We agree with Carlisle that the officers denied him

---

3. Detective Trimborn testified at the suppression hearing that he asked Carlisle no questions outside; instead, he claims Carlisle simply stated, "Brian, you're right. I did it." Subsequently, the detective says he advised Carlisle that while Carlisle was free to make a statement, Trimborn could not ask questions because Carlisle had invoked his right to have an attorney present. Trimborn did not claim to re-state the full *Miranda* warning. The detective testified Carlisle then proceeded to give a detailed account of the rape.

Carlisle, on the other hand, testified that once outside, Detective Trimborn continued attempting to persuade him to confess and informed him he would be charged with a lesser offense if he did so.

The circuit court chose to believe the detective's account, and since Carlisle does not argue that the court's findings of fact were erroneous, we continue our analysis taking the circuit court's factual findings as true.

the right to remain silent as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and therefore need not address the other basis of his appeal that he was denied access to legal counsel.

### Standard of review

In *Miranda v. Arizona, supra,* the Supreme Court of the United States ruled criminal suspects must be informed of their rights to remain silent and to have an attorney present before a custodial interrogation. *Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602. This rule was necessary because of the inherently coercive nature of custodial interrogation. *See id.,* 448–55, 86 S.Ct. 1602. Statements taken in violation of these principles are inadmissible at a criminal trial. *Id.* at 444–45, 86 S.Ct. 1602.

Our review of a circuit court's denial of a motion to suppress is ordinarily a two-step process. *Cummings v. Commonwealth,* 226 S.W.3d 62, 65 (Ky.2007) (citing *Welch v. Commonwealth,* 149 S.W.3d 407 (Ky.2004)). Pursuant to this process, "[t]he factual findings by the trial court are reviewed under a clearly erroneous standard, and the application of the law to those facts is conducted under *de novo* review." *Id.* Because Carlisle does not dispute the circuit court's findings of fact on appeal, we take them as true and proceed to *de novo* review of the court's conclusion Carlisle's right to remain silent was not violated.

### Right to remain silent

Once a suspect in custody has invoked his right to remain silent, the interrogation must cease. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (citing *Miranda,* 384

U.S. at 479, 86 S.Ct. 1602). However, statements made after such an invocation are admissible provided the authorities have "scrupulously honored" the defendant's right to remain silent. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (citing *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602).

The factors identified in *Michigan v. Mosley* which determine whether interrogating officers have, in fact, scrupulously honored a suspect's rights are: (1) whether the defendant was advised of his *Miranda* rights prior to the initial interrogation; (2) whether the detective conducting the interrogation "immediately ceased questioning [the suspect] after he invoked his right to remain silent and did not resume questioning or try to persuade [him] to reconsider his decision"; (3) the differences between the circumstances of the original and any subsequent interrogation, *e.g.,* whether the later questioning was about a different offense, after significant time had passed, in a different location, and/or conducted by a different officer; and (4) whether the suspect was re-read the *Miranda* warnings prior to the subsequent interrogation. *Mills v. Commonwealth,* 996 S.W.2d 473, 482–83 (Ky.1999). Application of these factors to the case *sub judice* reveals that Carlisle's right to remain silent was not scrupulously honored.

The officers' questioning of Carlisle can be viewed as three separate interrogations or three phases of the same interrogation.[4] The first occurred when Detective Trimborn escorted Carlisle to the police station and initiated the questioning. The detective properly issued

---

4. Although there has been disagreement about whether these three encounters between Carlisle and police officers each constituted an interrogation, we find they are all significant for purposes of analyzing whether

the officers scrupulously honored Carlisle's invocation of the right to remain silent. Whether they were technically interrogations is not necessarily relevant to this analysis.

*Miranda* warnings prior to asking the suspect any questions and ensured he understood them. However, although Detective Trimborn asked no further questions after Carlisle invoked his right to remain silent (*i.e.,* when he said, "I don't want to say no more[.]"), the detective continued his attempts at persuading Carlisle to confess. By telling Carlisle, "I don't want you to mess yourself up[,]" and encouraging him to "think about" his decision to remain silent because he needed to "help [him]self," Detective Trimborn was continuing his effort to have Carlisle waive the right to remain silent, or to confess in spite of it. This was improper.

Carlisle was next interviewed approximately six-and-one-half minutes later, by Officer Newman.

> The lapse of time is clearly relevant to the *Mosley* inquiry. *See id.* at 102, 96 S.Ct. at 326 ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned."). However, "the constitutionality of a subsequent police interview depends not on its subject matter, but rather on whether the police in conducting the interview sought to undermine the suspect's resolve to remain silent." *United States v. Schwensow,* 151 F.3d 650, 659 (7th Cir.1998), *cert. denied,* 525 U.S. 1059, 119 S.Ct. 626, 142 L.Ed.2d 565 (1998), citing cases from other circuits holding the same.

*Mills* at 483. In *Mills,* a lapse of ten to twenty minutes between the defendant's statement that he wished to remain silent and a subsequent interrogation caused the Kentucky Supreme Court concern. *Id.* A shorter lapse of time is even more analogous to that "momentary cessation" of in-

terrogation that *Mills* determined frustrated the purposes of *Miranda. Id.*

This second interview is also independently a cause for concern because Officer Newman actually began questioning Carlisle again about the same offense in the same location, without re-informing him of his *Miranda* rights. Newman also tried to convince Carlisle to waive his right to remain silent, suggesting Newman could offer help only if Carlisle did so. These factors clearly weigh in favor of finding "the police ... sought to undermine the suspect's resolve to remain silent." *Id.* (quoting *United States v. Schwensow,* 151 F.3d 650, 659 (7th Cir.1998), *cert denied,* 525 U.S. 1059, 119 S.Ct. 626, 142 L.Ed.2d 565 (1998)).

Carlisle's final encounter with police occurred when Detective Trimborn and Officer Newman returned to the interrogation room to complete paperwork to formalize Carlisle's arrest. The conversation between the police officers conveyed the prosecutor's position that if Carlisle "ain't said a word to try to help himself, then there will be no deals cut whatsoever." It was certainly meant for Carlisle's hearing and clearly designed to put pressure on the suspect to relinquish his right to remain silent. The detective's comment was effectively an ultimatum: either Carlisle would confess before Detective Trimborn finished the paperwork, or the prosecutor would "give him the maximum sentence in prison as a rapist." Additionally, and again, Detective Trimborn did not remind Carlisle of his right to remain silent upon re-entering the interrogation room, when stepping outside to permit Carlisle to smoke a cigarette, or when later recording Carlisle's confession following the smoke break.

Given the officers' repeated failure to comply with the requirements of *Miranda* and *Mosley,* it is clear they engaged in a

pattern of behavior designed to deprive Carlisle of his right to remain silent. We conclude that this is a case "where the police failed to honor a decision of a person in custody to cut off questioning ... by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105–06, 96 S.Ct. 321. The circuit court's ruling to the contrary must be reversed.

### Conclusion

Carlisle's confession was taken in violation of his right to remain silent during a custodial interrogation. We therefore reverse the circuit court's order denying Carlisle's motion to suppress the confession given to Detective Trimborn, vacate the defendant's guilty plea and sentence, and remand for additional proceedings consistent with this opinion.

ALL CONCUR.