STATE of Missouri, Respondent,

v.

Charles Michael O'NEAL, Appellant.

No. WD 74687.

Missouri Court of Appeals, Western District.

March 12, 2013.

Jessica P. Meredith, Jefferson City, MO, for appellant.

Margaret M. Johnston, Columbia, MO, for respondent.

Before Division One: MARK D. PFEIFFER, P.J., and VICTOR C. HOWARD and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Following a bench trial, Charles O'Neal was found guilty in the Circuit Court of Randolph County of first-degree murder, first-degree assault, and two counts of armed criminal action. The charges arose out of the shooting death of Dawn Kelly in Howard County on February 10, 2007. O'Neal appeals, arguing that statements he made during his third interrogation should not have been admitted into evidence, because he had invoked his right to remain silent before the interrogation began. We affirm.

## Factual Background[1]

In February 2007, O'Neal was involved in an on-again, off-again relationship with Amanda Kelly. Amanda[2] was 17 years old, and was staying in the same house in Howard County with her mother (Dawn Kelly); her mother's fiancé (Jared Forbes); her sister (Brooke Kelly); O'Neal's sister (Kelly O'Neal); and Kelly O'Neal's boyfriend (Tyrone Jackson).

Amanda had a child with Jeremy Barney. Amanda's ongoing contact with Barney was a source of contention between Amanda and O'Neal. At one point Amanda had broken up with O'Neal and resumed her relationship with Barney, before reconciling with O'Neal. In February of 2007, the relationship between O'Neal and Amanda had deteriorated to the point that Amanda decided she needed to end it. O'Neal had been told he was no longer welcome to stay at Dawn's residence, and Amanda had written him several letters explaining why she no longer wished to see him. She placed the letters with clothing O'Neal had left at Dawn's house. Amanda expected that, when O'Neal returned to retrieve his clothing, he would find the letters.

On the evening of February 9, 2007, Amanda went out with friends. O'Neal appeared at Dawn's house to speak with his sister and to retrieve his clothing. After picking up his clothes and Amanda's letters, O'Neal went to a friend's house and met Milo Carlson. O'Neal informed Carlson that Amanda had broken up with him; the two then left the friend's house, and "just went out driving around on gravel roads drinking beer and stuff." At

1. We recite the evidence in the light most favorable to the verdict. *State v. Winfrey*, 337 S.W.3d 1, 3 (Mo. banc 2011).

2. Family members of both O'Neal and the victim, Dawn Kelly, were involved in the underlying events. Because these individuals share the same surname with O'Neal or the victim, we use first names to identify certain individuals for the sake of clarity. No familiarity or disrespect is intended.

some point, O'Neal suggested that they "go shoot some beer cans out on a gravel road." Carlson retrieved a .22–caliber bolt-action rifle and ammunition from his house. The pair proceeded to a gravel road to shoot the rifle. O'Neal fired the gun once or twice, but then became distraught and began talking about Amanda. O'Neal complained that he had been mistreated by both Amanda and her mother Dawn. O'Neal ended the target shooting abruptly, stating "[w]e have to go now." O'Neal got into his truck, and Carlson followed. When both men were in the truck, O'Neal said "I want to go kill Dawn." O'Neal began driving to Dawn's house.

O'Neal and Carlson arrived at Dawn's residence in the early morning hours of February 10, 2007. O'Neal exited but told Carlson to wait in the truck. Four people were at the house: Dawn, Forbes, Brooke, and Kelly. Forbes was sleeping in the bedroom he shared with Dawn; Dawn and Kelly were in the living room. Brooke was in her bedroom listening to music on headphones. O'Neal entered the home. From her bedroom, Brooke heard Kelly exclaim, "Bubba, don't shoot me. Don't shoot me." ("Bubba" was O'Neal's nickname.) Brooke then heard a gunshot and went to her bedroom door. Kelly ran past her in the hallway and jumped out a window. Brooke went to the living room and saw her mother, Dawn, sitting on the couch. Dawn appeared to be sleeping. Brooke attempted to wake her. After slapping Dawn's cheeks and calling her name, Brooke realized that she had blood on her hands, and that Dawn had been shot.

While Brooke was in the living room with Dawn, O'Neal proceeded to Dawn's bedroom and woke Forbes. O'Neal pointed the rifle at Forbes and told him that "I'm going to kill you like I did your wife."

O'Neal ordered Forbes out of the bedroom, and told Forbes to get on his knees. Forbes complied. O'Neal pointed the rifle at Forbes' head.

Brooke saw O'Neal in the doorway of her mother's bedroom with a rifle, and exclaimed "Bubba, you shot my mom." When O'Neal turned toward Brooke, Forbes grabbed the barrel of the gun and pulled it so that the rifle was no longer pointed at him. O'Neal and Forbes began to struggle, and Forbes yelled for Brooke to call 911. Forbes struck O'Neal in the groin and O'Neal let go of the gun and stood up. O'Neal then left the house, threatening to return with another gun. Forbes barricaded the front door and then checked on Dawn. She had been shot in the eye and was dead. Forbes picked up the rifle and stood against the door in case O'Neal returned with another weapon.

O'Neal returned to his truck. He told Carlson that Forbes had tackled him while he had the rifle pointed at Dawn, and that the gun had gone off accidentally. The two proceeded to O'Neal's parent's house, where O'Neal repeated his account of an accidental shooting. O'Neal remained there until the police arrested him at approximately 2:00 a.m. on the morning of February 10. After being given the *Miranda* [3] warnings, O'Neal told the arresting officer that "[h]e was tired of being fucked with and this time he fucked back." O'Neal was taken to the Howard County Jail.

Sergeant David Rice of the State Highway Patrol interrogated O'Neal at the jail on three separate occasions on February 10: at approximately 4:00 a.m., 8:00 a.m., and 1:00 p.m. At the beginning of each interview O'Neal was informed of *his Miranda* rights, and in each of the three

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

interviews he signed a Notification of Rights form provided by Sergeant Rice. In the first and second interviews O'Neal repeated the account he had given to Carlson and his parents: that Forbes had unexpectedly tackled him from behind as O'Neal had the rifle pointed at Dawn, and that the gun had accidentally discharged. O'Neal's story changed in the third interrogation, however. In the third interview, O'Neal claimed that, while he held Dawn at gunpoint, she had refused to get Amanda on the telephone or tell O'Neal where Amanda was. O'Neal claimed that he started getting "really mad," and then "just kind of lost it." At that point, O'Neal stated that the gun went off. Forbes confronted O'Neal after the shooting. When asked if he pointed the gun at Forbes or threatened to shoot him, O'Neal responded that "it's possible." O'Neal stated that he had no intention of shooting Amanda or Dawn when he drove to Dawn's house; instead, his intention was to shoot Barney, the father of Amanda's child, and then kill himself.

O'Neal filed a pre-trial motion to suppress any statements made during the third interrogation. O'Neal's suppression motion was denied following an evidentiary hearing.

The case was tried to the court.[4] O'Neal's statements during all three interviews were admitted into evidence at trial. Following trial, the court found O'Neal guilty of murder in the first degree, assault in the first degree, and two counts of armed criminal action. He was sentenced to life imprisonment without eligibility for probation or parole for murder, and fifteen years' imprisonment for the assault conviction, to be served consecutively to the sentence for murder. O'Neal was also sentenced to twenty years' imprisonment for each of the two counts of armed criminal action, to be served concurrently with the murder and assault sentences. O'Neal appeals.

## Standard of Review

■ The State argues that we should review O'Neal's arguments only for plain error, because O'Neal failed to object to the admission of his pre-trial statements when they were offered at trial. We conclude, to the contrary, that O'Neal properly preserved his objections.

At the pre-trial suppression hearing, the State presented testimony from Sergeant Rice, and the audio recordings and transcripts of all three interviews were admitted into evidence. Sergeant Rice did not testify at trial. Instead, the parties agreed that the testimony and exhibits admitted during the suppression hearing would be treated as trial evidence. When the State offered the record of the suppression hearing into evidence, O'Neal's counsel stated: "[j]ust for the record we have no objection to stipulating to any of the evidence that was admitted and the testimony that the Court heard at the suppression hearing." After the prosecuting attorney listed the exhibits from the suppression hearing which were subject to the stipulation (which included the recordings and transcripts of O'Neal's interrogations), O'Neal's counsel repeated that "we have no objection."

■ The filing of a motion to suppress is insufficient to preserve an issue for appellate review; instead, a defendant

---

4. Prior to the bench trial, O'Neal had pled guilty to second-degree murder and related charges. He was allowed to withdraw his guilty plea as a result of a post-conviction relief motion, and then went to trial on charges of first-degree murder, first-degree assault, and two associated counts of armed criminal action.

must object when the challenged evidence is offered at trial:

> [w]hen a pretrial motion to suppress evidence is denied, the defendant must renew the objection or make a specific objection at trial when the evidence is presented to preserve the issue [for] appellate review. The trial court must be given the opportunity to reconsider its prior ruling against the backdrop of the evidence adduced at trial. Furthermore, the stating of "no objection" when the evidence is introduced at trial constitutes an affirmative waiver of appellate review of the issue, and, thus, the matter will not be considered under the plain error rule. As opposed to a simple failure to object, which may warrant plain error review, a statement by defendant's counsel that there is no objection to ... a particular piece of evidence precludes a finding that the failure to object was negligent or inadvertent and renders that evidence admissible.

*State v. Morrow*, 996 S.W.2d 679, 681–82 (Mo.App. W.D.1999) (citations and internal quotation marks omitted) [5]; *accord, State v. Lloyd*, 205 S.W.3d 893, 900–01 (Mo.App. S.D.2006).

█ Under this rule, it would seem that O'Neal waived *any* appellate review, even for plain error, by stating that he had "no objection" to the admission of the testimony and exhibits from the suppression hearing. This waiver principle is inapplicable, however, where the record reflects that "it was mutually understood that appellant did not intend to repudiate his prior objection"; in such circumstances, "this Court will likewise acknowledge [the objection's] continued validity." *State v. Baker*, 103 S.W.3d 711, 717 (Mo. banc 2003).

We have applied this "mutual understanding" principle in multiple cases. In

*State v. Hawkins*, 137 S.W.3d 549 (Mo. App. W.D.2004), a defendant filed a pretrial motion to suppress evidence, arguing that it was seized during an unlawful vehicle search. *Id.* at 555. Defense counsel renewed the objection during the trial testimony of two investigating officers. *Id.* Counsel stated that he had "no objection," however, when the physical evidence derived from the search was actually offered in evidence (after the conclusion of the State's case). We held that the objection to the admission of the evidence was properly preserved. In an opinion by Judge Breckenridge, we held that the circumstances justified application of *Baker*'s "mutual understanding" principle.

The State argues that this case is distinguishable from *Baker* because Mr. Hawkins never asked that his objection to the evidence on the basis of the alleged illegality of the stop and searches be a continuing objection. Despite his failure to specify the objection was a continuing one, however, it is clear, as it was in *Baker*, that neither the prosecutor nor the trial court misunderstood defense counsel's statement of "no objection" at trial. The prosecutor and the trial court could have reasonably interpreted defense counsel's statement of "no objection" to mean that he had no objection to the State introducing its exhibits at that time, rather than having to re-open its case to do so. Furthermore, the trial court considered Mr. Hawkins' claim in the motion for new trial. Not only did the prosecutor not object to the inclusion of the claim in the motion for new trial, but the prosecutor acknowledged that it was the same claim Mr. Hawkins had raised throughout the trial.

This case is similar to a case from this court, *State v. Stillman*, 938 S.W.2d 287,

---

5. Overruled on other grounds, *State v. Withrow*, 8 S.W.3d 75, 79 n. 3 (Mo. banc 1999).

290 (Mo.App. W.D. 1997), which was cited with approval in *Baker*, 103 S.W.3d at 716–17. In *Stillman*, defense counsel made a written motion to suppress, an oral motion to suppress before opening statements, and renewed his objections during the trial testimony. 938 S.W.2d at 290. There is no indication in *Stillman* that defense counsel stated that his objections were continuing. Although defense counsel stated "no objection" when the physical evidence was introduced, this court found that "the trial court and opposing counsel understood that defendant's counsel did not intend to waive the carefully made record on the motion to suppress the evidence." *Id.* This court reasoned that "[t]o now rule a waiver of this point and a denial of review would be a hypertechnical application of the requirement of renewing the objection at every stage." *Id.*

Likewise, this court finds that waiver of Mr. Hawkins' points concerning the motion to suppress and denial of review would be a hypertechnical application of the rule, in light of his consistently raising the issue at every stage of the proceedings. The State and the court understood Mr. Hawkins was not waiving the issue. Therefore, this court will review the denial of the motion to suppress on its merits.

*Id.* at 555–56. *See also State v. Mondaine*, 178 S.W.3d 584, 588 (Mo.App. E.D.2005) (defendant filed pre-trial motion to suppress, but stated "no objection" when evidence offered at trial; objection properly preserved where trial court stated that it would "overlook" the lack of a trial objection, and *sua sponte* considered, and denied, the motion to suppress); *State v. Martin*, 79 S.W.3d 912, 915 (Mo.App. E.D. 2002) (cited favorably in *Baker*; objection preserved where defendant filed a pre-trial suppression motion, and reasserted the motion at the commencement of a bench trial, but stated "no objection" when the challenged evidence was offered).[6]

The record in this case contains clear and unmistakable evidence that the trial court and the prosecution understood that O'Neal intended to preserve his suppression arguments, despite his statement that he had "no objection" to the admission of the suppression-hearing record into evidence at trial. At O'Neal's sentencing, his counsel raised the issue, and the following colloquy occurred:

MS. ALLEN [ (O'Neal's counsel) ]: Judge, the other issue I had written down—This is actually very important too. We realized after we left that Sergeant Rice never testified regarding these statements that we had the suppression hearing about. Because of that there was never an official objection during the trial renewing our objection during the suppression hearing. The issue here, I think, is either that we are presumptively ineffective for failing to do that. The other option I think the Court would have is since we were essentially incorporating the entire suppression hearing into the trial that our objections in the suppression hearing be incorporated into the trial, especially considering it's a bench trial. Obvious-

---

6. *State v. McWhorter*, 240 S.W.3d 761 (Mo. App. S.D.2007), suggests that a "mutual understanding" to preserve an objection will only be found where a defendant expressly requests, and is granted, a continuing objection during trial. *Id.* at 763–64 ("The request for a continuing objection is an integral part of the narrow exception carved out in *Baker*, because it signifies the mutual understanding between defense counsel, opposing counsel and the trial court that defense counsel intends to keep his objection alive throughout the trial."). As *Hawkins, Stillman, Mondaine* and *Martin* make clear, however, the "mutual understanding" rule recognized in *Baker* has not been applied so narrowly.

ly, those objections would have been made on the record had Sergeant Rice ever testified. However, the only time he testified was at the suppression hearing, which is when we were objecting to the statements coming in in the first place. So, I just wanted to try to clarify that.

I think if the Court doesn't consider that incorporated into the record then we would be presumed ineffective for not preserving that issue.

THE COURT: Mr. Zoellner, do you care to be heard on that issue?

MR. ZOELLNER [ (prosecuting attorney) ]: Judge, with respect to that issue *I think we all had assumed by incorporating we were incorporating those objections.* On behalf of the State I know there is always that thing—Well, if you didn't object—On behalf of the State we are not—*I will state that the State will not rely on that defense in terms of these statements.* I have no objection to them now incorporating them by way of the record or whatever. I think we all had assumed and understood that, but if we need to say it on the record.

THE COURT: *I think that is appropriate.* The Court will certainly deem— Since *the Court has the authority that any objections that were made at the suppression hearing,* particularly to the admission—Well, maybe any of the statements, but particularly to the last one *would be deemed as trial objections as well, and the Court's ruling at the suppression hearing would be the*

*ruling of the Court as a ruling on those objections as trial objections.*

(Emphasis added.)

Thus, while O'Neal agreed to the admission into the trial record of the testimony and exhibits from the suppression hearing, it is clear that the purpose of admitting the suppression record into evidence was simply to expedite this bench trial, and avoid the necessity of presenting the same evidence to the trial judge twice. The whole purpose of the suppression hearing was to develop a factual record *concerning O'Neal's objections;* it would be ironic to hold that the admission of the hearing record into evidence somehow waived the objections that hearing was convened to address. Neither the trial court nor opposing counsel believed that O'Neal had waived his suppression arguments; indeed, the prosecution promised that it would not raise preservation arguments in later proceedings,[7] and the trial court expressly stated that O'Neal's suppression-hearing objections "would be deemed as trial objections as well." In these circumstances, limiting O'Neal to plain-error review, or denying him any appellate review whatsoever, "would be a hypertechnical application of the requirement of renewing the objection at every stage." *Stillman,* 938 S.W.2d at 290. O'Neal is entitled to plenary review of his arguments concerning the admissibility of his pre-trial statements, despite his declaration that he had "no objection" when those statements were actually introduced at trial.

Because O'Neal properly preserved his arguments concerning the admissibility of

---

7. O'Neal's Brief cited the pages of the transcript we have quoted, to support the assertion that "the state and the court agreed that the issues raised in Appellant's motion to suppress were preserved for appeal." Br. at 18. Although we recognize that the State's appellate counsel was not counsel at trial, given O'Neal's specific citation to the relevant passage of the trial transcript, we are troubled by the State's advocacy of a plain-error review standard in this appeal, directly contrary to its assurances to the trial court.

his pre-trial statements, we review his claims under the following standards:

> Where a motion to suppress was overruled and the evidence was introduced at trial, appellate review considers the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted. This Court's review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. We view all evidence and reasonable inferences in the light most favorable to the trial court's ruling. We defer to the trial court's opportunity to determine the weight of the evidence and credibility of the witnesses when deciding whether sufficient evidence supports the trial court's determination. When, however, the issue to be decided involves the constitutional protection against forced self-incrimination, our review of the trial court's ruling is a two-part inquiry: we defer to the trial court's determinations of witness credibility and findings of fact, but consider the court's conclusions of law de novo.

*State v. Sardeson*, 220 S.W.3d 458, 464–65 (Mo.App. S.D.2007) (citations and internal quotation marks omitted).

## Analysis

O'Neal argues that the trial court erred in admitting into evidence the statements he made during his third interrogation. O'Neal claims that he invoked his right to remain silent under the Fifth and Fourteenth Amendments to the United States Constitution, and under Article I, §§ 10 and 19 of the Missouri Constitution, both at the conclusion of the second interview, and at the commencement of the third. O'Neal accordingly contends that the subsequent interrogation violated his constitutional rights. We disagree.

## I.

O'Neal first contends that the police violated his constitutional rights by even commencing the third interrogation, because he had unequivocally invoked his right to remain silent at the end of the second interview.

Sergeant Rice interrogated O'Neal three separate times on February 10, 2007. The first interview was conducted at 4:00 a.m., approximately two hours after O'Neal's arrest. Sergeant Rice read O'Neal the *Miranda* warnings, and O'Neal signed the Highway Patrol's Notification of Rights form. During the interview, which lasted approximately one hour and ten minutes, O'Neal told Sergeant Rice that Forbes surprised him from behind and the gun went off. O'Neal did not indicate that he wished to invoke his right to remain silent at any point during the first interview.

The second interview occurred at 8:05 a.m., approximately three hours after the first interview ended. Once again, O'Neal was read the *Miranda* warnings and signed the Notification of Rights form. Sergeant Rice presented evidence to O'Neal that seemed to conflict with his previous story; O'Neal persisted in his account that the gun went off when Forbes tackled him. Near the end of the interview, O'Neal repeatedly asked whether Dawn was okay. When Sergeant Rice informed O'Neal that Dawn was dead, O'Neal became upset, and stated, "[m]an, I can't talk about it no more, dude." Sergeant Rice ended the interview immediately. The third interrogation session, in which O'Neal made the statements whose admissibility he now challenges, began more than four hours later, at 1:05 p.m.

The trial court found that O'Neal's statement at the end of the second interrogation ("Man, I can't talk about it no more, dude.") was not an invocation of his right to remain silent; instead, the circuit court

concluded that this statement merely indicated that O'Neal was too overcome with emotion to talk further after hearing of Dawn Kelly's death.

We need not decide whether O'Neal's statement at the conclusion of his second interview invoked his right to remain silent with sufficient clarity. Even if it did, the initiation of the third interview, almost five hours later, did not violate O'Neal's rights.

■■■■ The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." [8] "Once a suspect invokes Fifth Amendment privileges interrogation must cease and the right to remain silent must be scrupulously honored." *State v. Bucklew*, 973 S.W.2d 83, 88 (Mo. banc 1998)(citing *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). Despite the duty to "scrupulously honor" a suspect's right to remain silent, however, "after a suspect initially invokes the right to remain silent, the police are not indefinitely precluded from asking whether the suspect has changed her mind and wants to talk." *Id.* Missouri courts consider multiple factors to determine whether renewed questioning violates a suspect's constitutional rights:

Factors courts weigh to determine whether the right to remain silent has been scrupulously honored include: (1) whether the police immediately ceased the interrogation upon defendant's request; (2) whether they resumed questioning only after the passage of a significant period of time and provided fresh *Miranda* warnings; (3) whether the object of subsequent interrogation was to wear down the resistance of the suspect and make him change his mind; (4) how many subsequent interrogations were undertaken; and (5) whether subsequent questioning involved the same crime.

*Bucklew*, 973 S.W.2d at 89 (citing *Mosley*, 423 U.S. at 104, 96 S.Ct. 321).[9]

■■■■ Consideration of the *Bucklew* factors establishes that Sergeant Rice "scrupulously honored" O'Neal's right to remain silent. As to the first factor, there is no dispute that O'Neal's second interrogation ended immediately after O'Neal told Sergeant Rice he could not talk further.

Because the third interrogation did not begin for almost five hours after the second interview ended, the second factor also weighs in the State's favor. As *Bucklew* notes, "[c]ourts have found law enforcement officials to have honored a suspect's right to terminate questioning scrupulous-

---

**8.** The Fifth Amendment's privilege against self-incrimination is applicable to the actions of state officials by virtue of § 1 of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

Although O'Neal cites to Article I, §§ 10 and 19 of the Missouri Constitution to support his arguments, the protection against compelled self-incrimination afforded by the state constitution is coextensive with the right recognized in the federal constitution. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). The discussion which follows thus applies equally to O'Neal's claims under both federal and state law.

**9.** While *Bucklew* derived five factors from *Mosley*, other courts have "enunciated different factors when reading the [*Mosley*] opinion." *Hebert v. Cain*, 121 Fed.Appx. 43, 46 n. 2 (5th Cir.2005) (citing *Anderson v. Calderon*, 232 F.3d 1053, 1066 (9th Cir.2000) (five-factor test); *Evans v. Rogerson*, 77 F.Supp.2d 1014, 1031 (S.D.Iowa 1999) (nine factors); *People v. Fleming*, 103 Ill.App.3d 194, 58 Ill. Dec. 956, 431 N.E.2d 16, 18 (1981) (three factors)); *see also, e.g., State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267, 282–83 (2012)(three factors); *People v. Bonilla–Barraza*, 209 P.3d 1090, 1095 (Colo.2009)(four factors); *Carlisle v. Com.*, 316 S.W.3d 892, 896 (Ky.App.2010)(four factors).

ly in cases where as little as a few hours separated a suspect's invocation of the right to remain silent and a subsequent interrogation." 973 S.W.2d at 88. Indeed, *Mosley* itself characterized "an interval of more than two hours," 423 U.S. at 104, 96 S.Ct. 321, as "the passage of a significant period of time." *Id.* at 106, 96 S.Ct. 321. Other cases similarly hold that intervals of one-to-four hours between interrogations are consistent with the police's duty to "scrupulously honor" a suspect's invocation.[10] The passage of an appreciable amount of time between O'Neal's second and third interrogations cuts against his claim that the mere institution of the third interview violated his rights.

Another consideration supports our conclusion that the second *Bucklew* factor favors the State. *Bucklew* observes that, "in cases in which suspects are freshly Mirandized prior to any attempts to resume an interrogation, courts find the suspect's original invocation of the right to remain silent scrupulously honored." 973 S.W.2d at 89. That is just what occurred here— Sergeant Rice advised O'Neal of *his Miranda* rights, again, at the commencement of the third interrogation session, and O'Neal acknowledged that advice by executing a Notification of Rights form. The fact that O'Neal was explicitly reminded of his right to remain silent at the outset of the third interview undercuts his present claim.

In regard to the third *Bucklew* factor, there is no indication that Sergeant Rice initiated the subsequent interview to "wear down the resistance of the suspect and make him change his mind." *Id.* at 88. Sergeant Rice interviewed O'Neal a third

time to attempt to resolve discrepancies between O'Neal's version of the events leading up to Dawn Kelly's death and the accounts conveyed to Sergeant Rice by Carlson and Kelly O'Neal between the second and third interviews. In addition, O'Neal showed signs of intoxication during the first and second interviews; waiting several hours before interviewing O'Neal a third time allowed him to sober up, and to sleep. Rather than seeking to take advantage of O'Neal by wearing him down, the time lapse permitted O'Neal to become more lucid and alert.

As to the fourth factor, Sergeant Rice only conducted one subsequent interview. *Id.* (noting that numerous cases have found that officers "scrupulously honored" a suspect's right to remain silent even when two or more subsequent interrogations occurred). The recorded portion of the third interview lasted just over twenty minutes. Sergeant Rice testified that the tape recorder was turned off, at O'Neal's request, for only ten-to-fifteen minutes during the interrogation. Thus, the third interrogation lasted well under an hour. This relatively short, single additional interview supports a finding that the State scrupulously honored O'Neal's rights.

The fifth factor (whether subsequent questioning involved the same crime) may generally favor O'Neal. *Bucklew* specifically recognizes, however, that "[t]he fact that subsequent police inquiry focuses on the same crime does not compel the conclusion that Fifth Amendment rights were not honored." *Id.* (citing *Jackson v. Wyrick,* 730 F.2d 1177, 1180 (8th Cir.1984)). Numerous cases hold that the fact that a

---

**10.** *See, e.g., Fleming v. Metrish,* 556 F.3d 520, 529 (6th Cir.2009) (three hours); *Riva v. Kirkland,* 315 Fed.Appx. 667, 669 (9th Cir.2009) (one hour); *United States v. Lugo Guerrero,* 524 F.3d 5, 12 (1st Cir.2008) (four hours); *United States v. Andrade,* 135 F.3d 104, 106– 07 (1st Cir.1998) (less than four hours); *United States v. Corral–Martinez,* 592 F.2d 263, 267 (5th Cir.1996) (cited in *Bucklew;* just over four hours); *State v. Franklin,* 390 S.C. 535, 702 S.E.2d 568, 572 (App.2010) (three hours).

later interrogation addresses the same crime as earlier interrogations is not disqualifying.[11] Here, O'Neal was given a fresh *Miranda* warning before the third interview commenced, and in all other respects his invocation of his right to remain silent at the end of the second interrogation was scrupulously honored; the fact that the third interrogation covered the same subject as the earlier interviews did not violate O'Neal's rights.

Therefore, even if O'Neal effectively invoked his right to remain silent at the conclusion of the second interrogation, we conclude that his invocation was not dishonored by Sergeant Rice's initiation of the third interrogation session.

## II.

O'Neal also argues that he unequivocally invoked his right to remain silent at the commencement of the third interview.

The third interview, initiated by Sergeant Rice, began at 1:05 p.m., almost five hours after the second interview ended. O'Neal was once again read the *Miranda* warnings and signed the Notification of Rights form. Sergeant Rice informed O'Neal that he had spoken with Carlson and O'Neal's sister Kelly. Sergeant Rice continued:

> Rice: ... So, obviously between you know what your sister has told us, and what Milo has said there's you know there's some things that again that [we] need to clear up. Okay?
>
> O'Neal: Mm hmm.

> Rice: Do you know what I'm talking about?
>
> O'Neal: (inaudible) talking about. I still don't feel like talking but, [I] feel terrible.
>
> Rice: I'm, I'm sure you do.
>
> O'Neal: You really don't know, you don't even know.
>
> Rice: How, how do you feel right now?
>
> O'Neal: Terrible, I want to die too; I swear I do them girls without their mom.

Sergeant Rice then asked O'Neal whether he "mean[t] for this to happen or was it just an accident," to which O'Neal responded that it was an accident. Sergeant Rice then emphasized (as he had during the prior interrogations) that it was important for O'Neal to tell his side of the story, fully and truthfully. O'Neal told Sergeant Rice that "the only way I'll do it" is if Sergeant Rice turned off the tape recorder. Sergeant Rice complied. Apparently, O'Neal then told Sergeant Rice his version of events. At 1:26 p.m., Sergeant Rice turned the tape recorder back on. Then, with Sergeant Rice's prompting, O'Neal repeated his account: that he had obtained the rifle and gone to Dawn's house with the intent to kill Jeremy Barney, the father of Amanda's child, and then to kill himself; but that when he got to the house and pointed the gun at Dawn, he became very upset when she refused to call Amanda or tell him Amanda's whereabouts, and the gun went off.

---

11. *See, e.g., United States v. Montgomery,* 555 F.3d 623, 634 (7th Cir.2009); *United States v. Lugo Guerrero,* 524 F.3d 5, 12 (1st Cir.2008); *United States v. Andrade,* 135 F.3d 104, 106–07 (1st Cir.1998); *United States v. McClinton,* 982 F.2d 278, 281–82 (8th Cir.1992); *State v. Bean,* 337 Wis.2d 406, 804 N.W.2d 696, 704 (App.2011); *State v. Palmer,* 791 N.W.2d 840, 849 (Iowa 2010) ("If we were to hold the subsequent questioning by the same officer about the same crime is the determinative factor, we would be creating 'a per se proscription of indefinite duration upon any further questioning *by any police officer on any subject.*' Such a holding would be contrary to *Mosley.*" (quoting *Mosley,* 423 U.S. at 102–03, 96 S.Ct. 321)(emphasis added by *Palmer*)); *State v. Benjamin,* 345 S.C. 470, 477–78, 549 S.E.2d 258 (2001).

O'Neal claims that his statement that "I still don't fell like talking" was an unequivocal re-invocation of his right to remain silent, which required Office Rice to immediately cease his interrogation of O'Neal.

> We have previously held that a suspect must give a clear, consistent expression of a desire to remain silent in order to invoke his rights adequately and cut off questioning. If a person subjected to custodial interrogation wishes to revoke his or her waiver of the right to remain silent, he or she is under an obligation to communicate this revocation in a clear and intelligible fashion. A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation. We consider the defendant's statements as a whole in determining whether they indicate an unequivocal decision to invoke the right to remain silent.

*State v. Wolf,* 91 S.W.3d 636, 643 (Mo.App. W.D.2002) (citations and internal quotation marks omitted).

As the United States Supreme Court recently explained,

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation *of Miranda* rights results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation. But as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.

*Berghuis v. Thompkins,* 560 U.S. 370, ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (citations and internal quotation marks omitted).

O'Neal's argument focuses on his isolated statement that "I still don't feel like talking." But in *State v. Clemons,* 946 S.W.2d 206 (Mo. banc 1997), our Supreme Court stated that "we do not read *Miranda* searching for out-of-context sentences that support a preferred outcome." *Id.* at 219. Instead, courts must look to the full context of a particular statement in order to determine whether a suspect invoked his rights or not.

While the isolated statement on which O'Neal relies could be interpreted as an invocation of his right to remain silent, that single remark is not all that O'Neal said. The remark O'Neal highlights was preceded by Sergeant Rice's statement that "there's some things that ... [we] need to clear up." Sergeant Rice then asked O'Neal, "Okay?," to which O'Neal responded affirmatively. Thus, immediately before saying that "I still don't feel like talking," O'Neal had indicated that he was willing to participate in a conversation "to clear up" inconsistencies between his

own account of events, and the statements made by Milo Carlson and Kelly O'Neal.

What O'Neal said *after* his purported invocation added further ambiguity. As part and parcel of his statement that he did not "feel like talking," O'Neal added: "but, [I] feel terrible." Even if O'Neal's statement that "I still don't feel like talking" could be considered as an unequivocal statement of his desire not to speak, it is undercut by what followed as part of the same sentence. As another court has explained:

> courts have found, under certain circumstances, that a suspect fails to unequivocally invoke the right to remain silent when what might otherwise be a clear statement is inextricably attached to language inconsistent with a wish to remain silent.... Courts have thus found ambiguity where an utterance conveying a desire to end questioning is "separated by little more than a breath" from further utterances that would lead a reasonable officer to doubt whether the defendant in fact wished to do so.

*State v. Rogers,* 277 Neb. 37, 760 N.W.2d 35, 60 (2009).

Here, O'Neal's use of the conjunction "but" is an equivocation, which suggests that he was experiencing an internal conflict: while he did not *want* to talk about what had happened, other factors compelled him to do so. Moreover, when Sergeant Rice responded to O'Neal's statement that he felt terrible by politely stating "I'm sure you do," O'Neal continued to speak, explaining his emotions.

Then, after only a single, broad question concerning Dawn's murder, O'Neal expressed his desire to tell his version of events, so long as the tape recorder was turned off. O'Neal's statement that he was willing to tell his story, so long as it was not audio-recorded, was *not* an invocation of his right to remain silent, but instead permitted Sergeant Rice to continue his questioning.[12]

Thus, in this case O'Neal initially stated that it was "Okay" for Sergeant Rice to talk to him to clarify certain issues. Although he then said that he did not feel like talking, he added "but, I feel terrible," suggesting that he was willing to talk despite his feelings. O'Neal then made clear that he would tell his side of the story, so long as the tape recorder was turned off. O'Neal's statements exhibit—at most—some ambiguity or equivocation as to whether he wished to invoke his right to remain silent. In these circumstances, Sergeant Rice was under no obligation to cease questioning, or to seek clarification from O'Neal as to how he wished to proceed.

We also note that, after the tape recorder was turned back on and O'Neal repeated his account of events, Sergeant Rice concluded the interrogation by asking O'Neal if his statements were truthful and voluntary:

> Rice: I don't think I have any other questions right now[,] uh[,] is that the truth what happened?
>
> O'Neal: Yes sir, I swear.

12. *See Connecticut v. Barrett,* 479 U.S. 523, 529–30, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (suspect's statement that he would not make a *written* statement without an attorney present did not bar police from continuing with *oral* questioning); *State v. Piatnitsky,* 170 Wash. App. 195, 282 P.3d 1184, 1198–1200 (2012)(suspect did not unequivocally invoke right to remain silent where he stated that he was unwilling to give an audio-recorded statement, but would provide a statement in writing); *Jones v. State,* 344 Ark. 682, 42 S.W.3d 536, 542 (2001)(suspect's request that law enforcement officers turn off tape recorder did not invoke suspect's right to remain silent); *People v. Samayoa,* 15 Cal.4th 795, 64 Cal. Rptr.2d 400, 938 P.2d 2, 25–26 (1997)(same).

Rice: Okay, I want to make sure during we've talked three times so far now three separate times I've brought you in here and we've talked during any of these times that we've talked has, have I or anyone else—

O'Neal: No you haven't.

Rice: Have they, have [they] coerced you or made you say anything against your will in any way?

O'Neal: No sir.

Rice: Okay I just want to make sure you understand that and you've understood your rights through all this we've treated you okay.

O'Neal: Yes sir.

 We recognize that "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request [for counsel] itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *see also, e.g., State v. Harris*, 305 S.W.3d 482, 489 (Mo.App. E.D.2010). But here, there was no clear request to remain silent at the outset. We refer to this concluding exchange not to undermine an unambiguous invocation O'Neal had previously made, but only as further confirmation that no invocation in fact occurred.

### III.

 Even if the trial court had erred by admitting O'Neal's statements from the third interrogation, he would still not be entitled to reversal if the admission of his statements was harmless beyond a reasonable doubt. *Bucklew*, 973 S.W.2d at 91.[13]

Because the unchallenged evidence in this case overwhelmingly establishes O'Neal's guilt, the admission of his statements during the third interrogation was harmless beyond a reasonable doubt. O'Neal has admitted from the outset that he was the one who shot Dawn Kelly on February 10, 2007. The only remaining question was whether the shooting was accidental or intentional. Even without considering O'Neal's statements during the third interrogation, the evidence was overwhelming that this was not an accidental shooting. At the time of his arrest, O'Neal's said that "[h]e was tired of being fucked with and this time he fucked back." This strongly suggests that he shot Dawn Kelly intentionally, because she had barred him from her home, and had refused to contact Amanda for him, or tell O'Neal where she was. Milo Carlson testified that O'Neal was distraught because Amanda had ended their relationship. Carlson testified that O'Neal expressed a specific intent to murder Dawn Kelly as he drove to her house, armed with a weapon he had borrowed from Carlson (which O'Neal had taken the time to test-fire). Brooke Kelly's testimony that Kelly O'Neal begged O'Neal not to shoot her, *before* the fatal shot was fired, indicates that O'Neal had the gun pointed at Kelly O'Neal and Dawn Kelly before the shooting. O'Neal's statement to Dawn Kelly's fiancé immediately after killing Dawn (that he was going to "kill [Forbes] like I did your wife"), as well as his later statement that he was going to retrieve another gun and return, further demonstrate his intent to kill.

We also note that the spent shell from the rifle had been manually ejected, and

13. We recognize that, in bench-tried cases, there is generally a "presumption that [a trial judge] will not give weight to incompetent evidence." *Worthington v. State*, 166 S.W.3d 566, 573 (Mo. banc 2005). Given that the admission of O'Neal's challenged statements was harmless beyond a reasonable doubt in light of the other evidence offered at trial, we need not decide whether this presumption properly applies in the circumstances of this case.

was found near Dawn's body. The action of ejecting the round, and preparing the rifle to be fired again, is consistent with Forbes' and Brooke's accounts of what happened, and is inconsistent with O'Neal's claim of a single, accidental discharge.

O'Neal's prior statements, during the first and second interrogations, provided further inculpatory evidence. For example, during the first interview, O'Neal initially claimed he had taken the rifle to Dawn's home to show it to Forbes, because he believed Forbes might be interested in purchasing the gun from Milo Carlson. But O'Neal admitted later in the first interrogation that this was a lie. He then claimed that he had returned to Dawn's house intending to kill himself (possibly after killing Jeremy Barney), but that he had no intent to harm Dawn. That explanation is contrary, however, to Milo Carlson's testimony that O'Neal expressed a desire to kill Dawn. Moreover, O'Neal's story that he only fired the gun after Forbes tackled him is contrary to Forbes' own testimony, and the testimony of Brooke Kelly; both witnesses testified that O'Neal woke Forbes from his bed, forced him to kneel, and pointed the rifle at him, only *after* shooting Dawn. In addition, in his second interrogation O'Neal denied that Milo Carlson was with him at the time of the fatal attack, a claim which is contradicted by Carlson's testimony. The trial court obviously concluded that O'Neal's pre-trial statements were false; these false exculpatory statements provide further evidence of his guilt. *See, e.g., State v. Tremaine*, 315 S.W.3d 769, 776 (Mo.App. W.D. 2010).

It is also significant that, after shooting Dawn, O'Neal left her home and fled, rather than attempting to aid her or awaiting the arrival of police. The trier of fact could conclude that these actions provide further evidence of O'Neal's guilt, and are inconsistent with his claim of an accidental shooting. *See, e.g., State v. Brown,* 337 S.W.3d 12, 17 (Mo. banc 2011); *State v. Beam,* 334 S.W.3d 699, 707 (Mo.App. E.D. 2011); *State v. Norman,* 243 S.W.3d 466, 469 (Mo.App. S.D.2007).

Based on the foregoing, we conclude that the admission of O'Neal's statements from his third interrogation, even if erroneous, was harmless beyond a reasonable doubt.

## Conclusion

The judgment of the circuit court is affirmed.

All concur.