

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86484 |
| | ) | |
| JAMES L. GANT, | ) | Filed: February 11, 2025 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Charles H. McKenzie, Judge**

**Before Division Two: Alok Ahuja, P.J., and**
**Edward R. Ardini, Jr. and W. Douglas Thomson, JJ.**

After a jury trial, James Gant was convicted of six felonies in the Circuit Court of Jackson County: unlawful use of a weapon; two counts of assault in the second degree; and three counts of armed criminal action. Gant appeals. He contends that the circuit court abused its discretion in overruling his objection to a witness' in-court identification of Gant, because the identification was unreliable due to impermissibly suggestive circumstances created by law enforcement. We affirm.

## Factual Background

We review the evidence "in the light most favorable to the jury's verdict." *State v. Winfrey*, 337 S.W.3d 1, 3 (Mo. 2011). Seen from that perspective, the facts are as follows:

On October 12, 2022, Officers J.G. and D.S.[1] were called to investigate a claim of aggravated assault with a firearm. A woman informed the officers that she saw two men searching through her brother's vehicle. One of the men was Caucasian with dark clothing and long blonde, curly hair. The other man was African-American and wearing a white hoodie. She yelled at the men, and the African-American man pointed a firearm at her. The two men then ran away. Officers J.G. and D.S. searched the area but did not find anyone matching the description of the two men.

A short time later, the officers received a call that the two men were leaving the area in a black sport-utility vehicle. The officers located a vehicle matching the caller's description and saw that a Caucasian male with blond curly hair was sitting in the rear middle passenger seat, and an African-American man with dreadlocks was sitting in the front passenger seat. The officers began following the vehicle, and decided to initiate a traffic stop to investigate. The vehicle started to pull over, then drove off quickly; during the subsequent pursuit it exceeded 100 miles per hour. While pursuing the vehicle, the officers saw an African-American man's arm sticking out of the rear right passenger-side window, holding a firearm. Multiple gunshots were fired from the rear right passenger window, first in the air then directly at the officers. During the pursuit,

---

[1]     Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this memorandum.

a total of twenty-to-thirty shots were fired from the sport-utility vehicle. The officers observed that the passenger in the rear right seat was wearing dark clothing.

The vehicle took a sharp turn, hit a curb and popped a tire. The driver, Z.O., pulled over and remained in the vehicle. The vehicle's four passengers fled into a wooded area. Law enforcement searched the area surrounding the vehicle and found two passengers, K.A. and K.T. Officers were unable to locate the other two passengers despite searching for approximately two hours. Z.O., K.A., and K.T. were arrested.

K.A. told police that there were five people in the vehicle. He identified the two remaining passengers as A.L. and a man known as "J-Dot." K.A. described J-Dot as an African-American man with facial tattoos who was wearing a black hoodie. K.A. also informed police that J-Dot was in the profile picture on K.A.'s Facebook page. Law enforcement located a picture on Facebook of "J-Dot New Wave." Police determined that J-Dot's legal name was James Gant. During a photographic line-up, K.A. identified Gant as J-Dot. K.A. stated that he and Gant told Z.O. to flee when law enforcement initiated the traffic stop of Z.O.'s vehicle, and that Gant fired at the police out of the rear passenger window during the pursuit.

Z.O. was also interviewed after his arrest. He identified K.T. as the individual riding in the front passenger seat of the vehicle. He stated that the man in the rear passenger-side seat was an African-American male wearing a black hoodie, whose name started with the letter "J." Z.O. told police that he had initially met the man a month earlier, and that his nickname was either "J.B." or

"J.P." Z.O. also stated that shots were fired from all of the windows of the sport-utility vehicle, with the exception of the driver's window.

K.T.'s and Gant's DNA was found on the trigger of one of the guns found near where the sport-utility vehicle stopped; K.T. was the more significant contributor.

On November 18, 2022, Gant was indicted on six felony charges: unlawful use of a weapon; two counts of assault in the second degree; and three counts of armed criminal action. Following his arrest, Gant and Z.O. were detained in the same jail pod for several weeks before being separated. Z.O. testified that, while they were in the jail pod together, he recognized Gant as one of his co-defendants. Z.O. testified that he and Gant discussed the number of shots K.T. had fired during the police pursuit. Gant told Z.O. that Gant had hidden from police in a boat after the car chase ended, but had been identified by a juvenile.

Before trial, Gant filed a motion *in limine* to exclude any in-court identification by Z.O. The motion argued that any identification of Gant which Z.O. might make was tainted by the fact that Z.O. and Gant had been housed together in the jail. Gant argued that this circumstance was unduly suggestive, and made any subsequent identification by Z.O. unreliable. The circuit court denied Gant's motion *in limine*.

Gant's jury trial began on April 4, 2023. After testimony from Officer D.S., but before Z.O.'s testimony began, defense counsel examined Z.O. under oath outside the presence of the jury as part of an offer of proof challenging the admissibility of Z.O.'s in-court identification.

4

During the offer of proof, Z.O. testified that he told police in his initial interrogation that the rear passenger-side occupant of the sport-utility vehicle was wearing a black hoodie, and that the man was known as "J.D." or "J.P." Z.O. testified that he had met Gant before the day of the car chase, through K.T. At that time, Gant had used a nickname starting with the letter "J." Z.O. testified that, when he was detained in the jail pod with Gant, they "recognized one another and realized that [they were] co-defendants in this case." When Z.O. reached an agreement to cooperate with the State, he asked to have Gant removed from his pod.

Although Z.O. had met Gant before October 12, 2022, and recognized Gant when they were housed together in the jail pod, Z.O. agreed with defense counsel that, if he had been asked on the day of his arrest "to identify who was the person in your back rear seat," he "would not have been able to identify that person as James Gant." Z.O. testified that police never had him view a photographic or corporeal lineup; the first time he would be identifying Gant as an occupant of the vehicle would be during trial.

The circuit court again denied Gant's motion to exclude Z.O.'s identification. The court stated that Gant's contention that Z.O.'s identification had been improperly influenced by his detention in the same jail pod as Gant "goes to the weight [of that identification], not to whether it's admissible." The court advised defense counsel that "all the subject matter is certainly available for cross-examination."

Z.O. then testified in the jury's presence, without further objection, that Gant was one of the occupants of the vehicle Z.O. had been driving on October 12,

5

2022, and that Gant had fired shots during the police pursuit. Z.O. definitively identified Gant as the individual who was in his vehicle, in the rear passenger-side seat, during the car chase. Z.O. testified that he had met Gant once, approximately a month before October 12, 2022, with K.T., when he had given Gant a ride. They spent approximately fifteen minutes together. Z.O. testified that, when questioned by police after the car chase, he told them that he "knew [Gant] by J. – his nickname started with a J."; he testified that, at the time, he could only remember that Gant's name started with a "J." Z.O. also described Gant's clothing to police. Z.O. agreed with defense counsel that, because they had met before, he "already knew when [Gant] got in [Z.O.'s] vehicle that his nickname started with a J."

Z.O. testified that, approximately a month after the car chase, he encountered Gant again:

> Q. Did you ever run into the person that was seated in the back passenger rear of your car on October 12th, 2022?
>
> A. Yes.
>
> Q. And when you had contact with this person, did he recognize you, did you recognize him, what happened?
>
> A. We both were looking at each other and we kind of basically realized we was in the same car.
>
> Q. Okay. And did you guys – when you say you realize you were in the same car, did you end up having conversations or have a conversation about what happened on October 12th?
>
> A. Yes.

Z.O. testified that while he was with Gant in jail, Gant "confessed to being in [Z.O.'s] vehicle," and that he and Gant discussed that K.T. "was basically crazy

for shooting that many times on the highway." Gant told Z.O. that he had hidden from police "in a boat or something like that," but was identified by a juvenile.

During cross-examination, Z.O. admitted that "[t]he jail helped [him] recognize [Gant] more."

The jury found Gant guilty of all six charges. The circuit court sentenced Gant to fifteen years' imprisonment on the unlawful use of a weapon and second-degree assault charges, with the sentences to run concurrently to one another. Gant was also sentenced to three years' imprisonment on each of the armed criminal action convictions. The armed criminal action sentences were ordered to run concurrently to one another; but the armed criminal action sentences were ordered to run consecutively to the sentences on the underlying felonies. Thus, Gant was sentenced to a total term of imprisonment of eighteen years.

Gant appeals.

## Discussion

In his sole point on appeal, Gant argues that the circuit court abused its discretion in overruling his objection to Z.O.'s in-court identification. Gant contends that Z.O.'s identification was unreliable, because it was based on the unduly suggestive circumstance that Gant and Z.O. were housed together in the jail for a period of time following Gant's arrest. Gant argues that the unduly suggestive circumstances created a substantial risk of misidentification.

## I.

We first address the State's claim that Gant's objection to Z.O.'s identification was not properly preserved, because Gant did not repeat his objection when Z.O. identified Gant before the jury.

7

Defense counsel initially raised the issue of the admissibility of any in-court identification by Z.O. in a pre-trial motion *in limine*. The circuit court denied the motion, but observed that "[i]t is apparent to anyone that tries lawsuits that you should bring this up again at the time" Z.O.'s testimony was offered at trial. The circuit court's reminder to object during trial is consistent with the caselaw holding that "a trial court's ruling on a motion *in limine* seeking to exclude evidence is considered interlocutory in nature and is subject to change during the trial." *State v. Chambers*, 234 S.W.3d 501, 511 (Mo. App. E.D. 2007) (quoting *State v. Mickle*, 164 S.W.3d 54-55 (Mo. App. W.D. 2005)). "As such, a motion *in limine* preserves nothing for appeal." *Id.* "'To properly preserve a challenge to the admission of evidence for appellate review, the objecting party must make a specific objection at the time of the attempted admission of the evidence.'" *State v. Gee*, 684 S.W.3d 363, 376-377 (Mo. App. W.D. 2024) (quoting *State v. Spears*, 452 S.W.3d 185, 196 (Mo. App. E.D. 2014)); *see also State v. Wolf*, 91 S.W.3d 636, 642 (Mo. App. W.D. 2002).

Defense counsel's objections in this case were not limited to the motion *in limine*, however. Defense counsel *also* objected to Z.O.'s identification of Gant during trial. Prior to Z.O.'s testimony before the jury, defense counsel conducted a *voir dire* examination of Z.O. under oath, during which defense counsel highlighted the unduly suggestive circumstances which purportedly made Z.O.'s identification unreliable. The circuit court denied Gant's objections, ruling that Gant's concerns related to the weight, not the admissibility, of Z.O.'s in-court identification. The court also advised defense counsel that he could explore those issues during Z.O.'s cross-examination. Gant renewed his objection to the

admission of Z.O.'s in-court identification in his motion for new trial; notably, the State responded to the merits of Gant's argument, without ever suggesting that Gant's objections to Z.O.'s testimony had not been adequately preserved.

The Missouri Supreme Court has made clear that

"[o]ur rules for preservation of error for review are applied, not to enable the court to avoid the task of review, nor to make preservation of error difficult for the appellant, but, to enable the court – the trial court first, then the appellate court – to define the precise claim made by the defendant."

*State v. Amick*, 462 S.W.3d 413, 415 (Mo. 2015) (quoting *State v. Pointer*, 887 S.W.2d 652, 654 (Mo. App. W.D. 1994)). Consistent with this pragmatic, non-technical approach to preservation questions, Missouri courts have held that an issue is properly preserved for appellate review so long as the circuit court and the State "mutually understood" that a defendant intended to preserve a previously stated objection. *State v. Baker*, 103 S.W.3d 711, 717 (Mo. 2008); *State v. O'Neal*, 392 S.W.3d 556, 562-63 (Mo. App. W.D. 2013). A pretrial motion *in limine* is not enough to invoke this "mutual understanding" principle; instead, the record must reflect "some action or actions by the trial court or the prosecutor that occurred after the trial began [which evidences] a mutual understanding." *State v. Williams*, 411 S.W.3d 274, 278-79 (Mo. App. S.D. 2013) (collecting cases). Under the "mutual understanding" principle, courts have found issues to be preserved even where the defendant was not expressly granted a continuing objection, and even where defense counsel stated that they had "no objection" when the challenged evidence was actually introduced. *O'Neal*, 392 S.W.3d at 562-63 (collecting cases).

9

The "mutual understanding" principle is fully applicable here. In this case, Gant's counsel filed a pre-trial motion *in limine* which laid out the legal basis for his objection to any identification testimony from Z.O. But counsel went further: he conducted an extensive *voir dire* examination of Z.O., under oath, during the evidentiary phase of Gant's trial, before Z.O. offered the challenged identification. The purpose of Gant's *voir dire* examination would have been apparent to all concerned, since counsel began by stating that he wished "to reincorporate authority [and] arguments [in] defendant's second motion *in limine*," and then briefly described what those arguments were. After the *voir dire* examination, the circuit court expressly ruled on Gant's objection. And, when Gant raised the issue after trial, in his motion for new trial, the State responded to that argument on the merits, without ever suggesting a preservation problem. *See Baker*, 103 S.W.3d at 716 (noting that "the prosecutor did not object to the inclusion of th[e] [defendant's] claim in the motion" for new trial, in finding the "mutual understanding" principle to be applicable); *State v. Hawkins*, 137 S.W.3d 549, 556 (Mo. App. W.D. 2004) (same).

We recognize that the circuit court did not expressly grant Gant a continuing objection, and that Gant did not repeat his objection at the moment when Z.O. identified Gant to the jury. The record reflects, however, that all parties understood what Gant's objection was, and understood that he did not intend to abandon that objection. "In these circumstances, limiting [Gant] to plain-error review, or denying him any appellate review whatsoever, 'would be a hypertechnical application of the requirement of renewing the objection at every

stage.'" *O'Neal*, 392 S.W.3d at 564 (quoting *State v. Stillman*, 938 S.W.3d 287, 290 (Mo. App. W.D. 1997)).

## II.

We now turn to the merits of Gant's suggestive-identification claim.

We review the circuit court's denial of a motion to exclude evidence for abuse of discretion. *State v. Gordon*, 551 S.W.3d 678, 681 (Mo. App. W.D. 2018).

> A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. Even if the trial court's ruling admitting or excluding the evidence is error, reversal is not justified unless the error was so prejudicial that it deprived the defendant of a fair trial such that the verdict would have been different.

*Id*. at 681-82 (citation omitted).

To determine whether an in-court identification should be excluded, the circuit court must consider two questions: (1) whether unnecessary, and unduly suggestive, identification procedures were used; and (2) whether the improper identification procedures creates a substantial likelihood of misidentification:

> [T]he Court has said that due process concerns arise only when law enforcement officers used an identification procedure that is both suggestive and unnecessary. To be impermissibly suggestive, the procedure must give rise to a very substantial likelihood of irreparable misidentification. It is not enough that the procedure may have in some respects fallen short of the ideal. Even when an unnecessarily suggestive procedure was used, suppression of the resulting identification is not the inevitable consequence. Instead, the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. Reliability of the eyewitness identification is the linchpin of that evaluation. The factors affecting reliability include the opportunity of the witness to view the criminal

11

at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Sexton v. Beaudreaux*, 585 U.S. 961, 965-66 (2018) (cleaned up). "A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." *State v. Callaghan*, 564 S.W.3d 339, 343 (Mo. App. W.D. 2018) (cleaned up).

"While reliability is the linchpin in determining the identification testimony's admissibility, the defendant must clear the suggestiveness hurdle before procuring a reliability review." *State v. Townsel*, 564 S.W.3d 731, 736 (Mo. App. W.D. 2018). "[T]he defendant must first carry the burden of demonstrating the presence of impermissibly suggestive police identification procedures before the reliability of an eyewitness identification may be considered." *State v. Body*, 366 S.W.3d 625, 630-631 (Mo. App. E.D. 2012).

Gant argues that placing Z.O. and Gant in the same jail pod was unduly suggestive. He alleges that Z.O.'s identification resulted from this suggestive circumstance, rather than from his first-hand observation of Gant on October 12, 2022.

Gant's argument is fundamentally flawed. While he cites caselaw concerning the State's use of unduly suggestive "identification procedures," this case does not involve the procedures employed when Z.O. identified Gant. Z.O. first identified Gant during trial – but Gant does not challenge the procedures under which that in-court identification occurred. Rather, Gant's argument hinges on the manner in which Z.O. and Gant were detained following their

arrests, months before Z.O. identified Gant at trial. The State never asked Z.O. to identify Gant while they were housed in the same jail pod; indeed, at the time Z.O. had not even agreed to cooperate with the State in Gant's prosecution. This case does not involve the "identification procedures" the State employed with Z.O.

In addition, Gant does not dispute that the placement of Gant and Z.O. in the same jail pod was inadvertent. Gant makes no argument that law enforcement intentionally placed Z.O. in the same jail pod as Gant in order to encourage Z.O. to identify Gant as one of the shooters during the police pursuit.

The Missouri Supreme Court rejected a similar claim of an identification tainted by a chance encounter in *State v. Summers*, 445 S.W.2d 369 (Mo. 1969). In *Summers*, a cashier placed money in a pillowcase held by the defendant during an armed robbery of a St. Louis Housing Authority office. The police later arrested the defendant on unrelated charges. The police visited the Housing Authority office where the robbery occurred to visit with the office manager. "Considering it not wise to leave defendant in the car, they took him into the Housing office with them, apparently in handcuffs." *Id.* at 370. The cashier saw the defendant, and recognized him as one of the perpetrators of the armed robbery. When she told one of the arresting officers, "he thought at first she was joking," *id.*, but then had her confirm her identification during a physical lineup at the police station. *Id.*

Relying on *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), the defendant in *Summers* argued that the cashier's identification should have been excluded, because "the police station lineup, following within a few hours, was highly

13

suggestive and made when the viewers could not have eradicated from their memories the prejudicial events earlier in the afternoon at the Housing Authority office." *Summers*, 445 S.W.2d at 371. The Supreme Court rejected the suggestive-identification claim because the police did not *intentionally* expose the cashier to the defendant in order to elicit an identification:

> [O]n the record before us, there was nothing staged, contrived or guided about the confrontation or identification which occurred when the detectives brought defendant with them into the business premises . . . . It was only by coincidence the police had the man with them and that [the cashier] happened to see and recognize him as the robber. Assume she had been walking down the street and happened to see the defendant in the police car with the detectives, waiting at a traffic signal, recognized him and then informed the police. There is no difference in principle. We do not have here a "* * * confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence * * *."

*Id.* (quoting *United States v. Wade*, 388 U.S. 218, 228 (1967)).

Similarly, in *State v. Greathouse*, 694 S.W.2d 903 (Mo. App. S.D. 1985), this Court rejected a Due Process challenge to an identification, where the defendant claimed that the identification had been improperly influenced by the fact that the witness had seen the defendant at the defendant's preliminary hearing. The Court explained that no Due Process violation could be found, because the State had not engineered the encounter to influence the witness' testimony:

> The confrontation complained of in this case . . . appears not to have been designed or compelled by the State; the encounter was a coincidence. Most courts which have considered such coincidental encounters, or accidental showups, as they are sometimes called, have taken the view that no due process issue is raised by an

14

> accidental showup because the confrontation was not compelled by the State.

*Id.* at 907 (citations omitted); *see also State v. Scott*, 534 S.W.2d 537, 539 (Mo. App. 1976) (following *Summers* and rejecting suggestive-identification claim where a witness inadvertently saw the defendant being escorted by an officer in the police station's hallway before a physical lineup).

Although *Summers*, *Greathouse* and *Scott* are older decisions, they are consistent with more recent caselaw. The Supreme Court of the United States dealt with a similar situation in *Perry v. New Hampshire*, 565 U.S. 228 (2012). In *Perry*, the defendant broke into several cars in an apartment building parking lot. After police were summoned, they encountered the defendant in the parking lot. A police officer asked the defendant, who was not then under arrest, to stay in the parking lot with another officer, while the first officer interviewed some of the apartment's residents. When the first officer asked one apartment resident to describe the robber, the resident "pointed to her kitchen window and said the person she saw breaking into [her neighbor's] car was standing in the parking lot, next to the police officer." *Id.* at 234. Although the resident was not able to identify the defendant from a photo array she was later shown, her identification at the time of the crimes was admitted into evidence at the defendant's trial. *Id.*

The Supreme Court of the United States held that, because the police had not employed any improperly suggestive identification procedures, there was no basis to exclude the eyewitness' identification on Due Process grounds. The Court explained:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. . . . Our decisions . . . turn on the presence of

state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at 232-33 (footnote omitted).

*Perry* emphasized that a key purpose of excluding tainted identifications was to deter improper police conduct – an objective which was not furthered when police did not act improperly.

A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place. Alerted to the prospect that identification evidence improperly obtained may be excluded . . . police officers will "guard against unnecessarily suggestive procedures." This deterrence rationale is inapposite in cases, like Perry's, in which the police engaged in no improper conduct.

*Id.* at 241-42 (citations omitted). The Court explained that "the due process check" established by the suggestive-identification caselaw was linked "not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id.* at 242.

In the wake of *Perry*, no Due Process violation occurs when police conduct inadvertently exposes a witness to the defendant, without any intent to influence the witness' later identification of the defendant. In *Perry* itself, the dissenting justice recognized that this was the upshot of the Court's holding:

As this case illustrates, police intent is now paramount. As the Court acknowledges, Perry alleges an "accidental showup." . . . For

the majority, the fact that the police did not intend that showup, even if they inadvertently caused it in the course of a police procedure, ends the inquiry.

*Id*. at 255 (Sotomayor, J., dissenting).  Other courts have recognized that, in the wake of *Perry*,

> accidental show-up identifications that result "from mere happenstance, such as where a witness is present in police headquarters for some purpose other than to effectuate an identification, and by chance views and identifies a suspect who is being processed in another room", do not raise due process concerns, "as long as the spontaneous encounter was not caused by police misconduct or questionable police procedures."

*People v. Rodriguez*, 949 N.Y.S.2d 441, 443 (App. Div. 2012) (citations omitted); *accord*, *State v. Brown*, 223 So.3d 88, 106 (La. App. 2017).  Other courts have held that no Due Process violation occurs where police publicize a defendant's image, which a witness views, so long as there is no evidence that the police released the image in order to influence potential witnesses.  *State v. Davis*, 191 A.3d 1147, 1153–54 (Me. 2018); *State v. Goudeau*, 372 P.3d 945, 980 (Ariz. 2016); *State v. Webster*, 104 A.3d 203, 208 (N.H. 2014).

In this case, Gant's suggestive-identification claim is not based on the circumstances surrounding Z.O.'s in-court identification.  And there is no evidence that law enforcement intentionally placed Z.O. in the same jail pod as Gant in order to influence Z.O.'s testimony.  This case simply does not involve a "'confrontation compelled by the State between the accused and [a witness] . . . to elicit identification evidence.'"  *Summers*, 445 S.W.2d at 371 (quoting *Wade*, 388 U.S. at 228).  Because Gant has failed to "show that the pretrial identification procedures employed were impermissibly suggestive," *Townsel*, 564 S.W.3d at

736, it is unnecessary to separately consider the reliability of Z.O.'s in-court identification.

As the circuit court held, the circumstances surrounding Z.O.'s interactions with, and identification of, Gant were matters to be considered by the jury in assessing the credibility and weight of Z.O.'s testimony. Those circumstances did not justify the exclusion of his testimony on constitutional grounds.

### Conclusion

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.